2021 IL App (2d) 180592-U
No. 2-18-0592, 2-18-0605 &2-18-0606 cons.
Order filed December 20, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-739 |
| SCOTT J. TURYNA, | ) ) | Honorable Donald Tegeler, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court improperly found that defendant's sentences were mandatorily consecutive, but the court did not rely on improper sentencing factors; we vacate the order for consecutive sentences and remand to trial court for further consideration.

¶ 2   Following a jury trial, defendant, Scott J. Turyna, was convicted of aggravated discharge of a firearm, reckless discharge of a firearm, and aggravated domestic battery. He was acquitted of attempted murder. The trial court sentenced him to 2 years' imprisonment for reckless discharge of a firearm, 5 years' imprisonment for aggravated domestic battery, and 12 years' imprisonment for aggravated discharge of a firearm. The 2-year and 5-year sentences were to run concurrently,

but consecutive to the 12-year sentence. The trial court determined that the consecutive sentence it imposed was mandatory. Defendant now appeals, arguing that the trial court erred in determining that consecutive sentences were mandatory and that it relied on improper factors in imposing a sentence. For the reasons that follow, we vacate that portion of the trial court's order imposing consecutive sentences; otherwise, we affirm defendant's sentences and remand for further consideration.

¶ 3                                    II. BACKGROUND

¶ 4     Defendant was charged with one count of attempted murder, two counts of aggravated discharge of a firearm, and one count of aggravated domestic battery. Trial began on January 30, 2018.

¶ 5     The State's first witness was Steven Spurling. On May 3, 2016, at about 6 or 6:15 p.m. Steven and his wife, Diane, took their dog for a walk. At approximately 6:25 p.m., they were walking on the sidewalk through a residential area on Hunt Club Road in St. Charles. They heard a "loud bang on the garage door of the next house" that they were approaching. The door started to open, and a woman rolled out underneath it. The woman (Suzette Turyna, the victim) stood up. She appeared panicked, and there was "some blood on her face." Her face was "swollen and red." Suzette ran down the driveway and tripped when she got to the sidewalk. She "fell flat on her face." Steven tried to help her. Suzette said, "[H]e's gone nuts, he's trying to kill me, he did this." As Suzette stood up, defendant exited the garage. Defendant approached, said Suzette had fallen and was okay now, and asked her to come back inside. Suzette stated that defendant had a gun. Suzette started to walk away with Diane. Suzette said to defendant, "[Y]ou know I love you but this has to stop."

¶ 6        Defendant attempted to follow Suzette, but Steven blocked his path. Steven pulled out his phone to call 911, and while he looked down to dial, he heard a gunshot. Steven looked up and saw defendant fire again. Steven was about three steps behind defendant, looking over defendant's shoulder. He noted that defendant was holding the gun level with the ground, in a horizontal position, pointing in the direction of the two women. Defendant moved the gun from left to right, which was the direction Suzette was running. Further, after the gun recoiled, defendant brought it back to level. Steven then tackled defendant. After he landed, Steven saw the gun underneath himself, and just above defendant's shoulder, so Steven grabbed it and threw it across the sidewalk. Steven remained on top of defendant, waiting for the police. Steven testified that he smelled alcohol on defendant.

¶ 7        On cross-examination, Steven agreed that prior to hearing the bang from the garage, he did not hear any other sounds emanating from the house. The bang occurred at about the time Suzette was exiting the garage. Steven was unsure what portion of Suzette's face hit the sidewalk when she fell near the end of the driveway; however, he testified that "[s]he hit very hard." When defendant came out of the garage, he was not screaming, yelling, or running. After seeing defendant, Steven returned his attention to Suzette. Defendant approached and spoke to Suzette.

¶ 8        Steven estimated that the time between the first shot he heard and the last one was two seconds, though he later stated it could have been three seconds. Steven tackled defendant as soon as he realized defendant was shooting. Steven acknowledged that he may have only heard four shots. He was not sure where his wife was during the shooting, but he believed she was near Suzette.

¶ 9    Steven stated that he observed Suzette zigzagging back and forth as he looked over defendant's shoulder during the shooting. Steven clarified that after Suzette exited the garage, she spoke with defendant twice and defendant did not at either point attempt to shoot her.

¶ 10    The State next called Diane Spurling. She testified that she was married to Steven. On May 3, 2016, at about 6:25 p.m., they were taking their dog for a walk. They were near the intersection of Hunt Club Road and Steeplechase Road. As they approached the driveway of a house, Diane "heard kind of a thud." The garage door was about halfway up, and a woman rolled under the door. The woman—Suzette—stood and ran down the driveway. Diane noted that her face was bloody and bruised. Suzette fell where the driveway meets the sidewalk. She stated that her husband had beat her. She appeared scared. Steven handed Diane the dog's leash and went to help Suzette. A man—defendant—then came out of the garage. Defendant appeared calm. Defendant approached Suzette and Steven. As defendant approached, Suzette stated that he had a gun. Diane did not see a gun, and she started to walk away. Suzette came up beside her. They took a couple steps, and Diane heard, "pop, pop." Her dog ran and pulled her to the ground. She then "heard a couple more pops." Diane testified that she was laying on her stomach and could see Suzette run across the road. She looked back and saw Steven laying on top of defendant. She heard four shots. Suzette ran to a house up the street that was owned by friends of Diane and Steven. The friends' daughter, Sarah, let Suzette in the house.

¶ 11    On cross-examination, she testified that when the dog ran, she took a step or two before falling. She did not tell Steven about falling until after they were interviewed by the police. She did not know the direction in which defendant had fired the gun. Prior to this incident, Diane had known defendant and Suzette from the neighborhood, but they did not interact socially.

¶ 12    Jack Martino was the State's next witness. He testified that on May 3, 2016, at about 6:20 p.m., he was driving home from wrestling camp on Hunt Club Road in St. Charles. He was with a teammate. He pulled up to a stop sign and "noticed a little altercation going on." He explained, "There was a group of people and there was kind of a weird tension going on." Two men and two women were standing on the sidewalk. One of the women had blood on her face. Martino proceeded on, and he heard "loud bangs and pops." He heard two or three shots. In his rearview mirror, he could see that one of the men had "leveled his arm as if holding a gun." He could not actually see the gun. He drove a bit further, pulled over, and called 911. Martino looked back and saw that the man had been tackled. On cross-examination, he stated that at the time of the shooting, his windows were down and he was listening to music. He later added that the music was not loud. He agreed that he did not know where defendant was aiming the gun.

¶ 13    Sarah McWeeney testified next for the State. She lived at 502 Steeplechase Road near where it intersects with Hunt Club Road. On May 3, 2016, at about 6:25 p.m., she was home alone, watching television in the family room. She heard three to five loud bangs and "then heard a very loud knocking on [their] door." Sarah looked out a window and saw Suzette, whom she did not know. She then went to the door, opening the interior door only. Suzette was "very bruised and bloody" and "very panicked." Sarah did not let Suzette in immediately because she was not sure if it was safe. Suzette stated she needed to call 911, and Sarah let her in after Diane waved to her and told her to let Suzette in. Suzette came in and called 911.

¶ 14    Later that evening, after Suzette had left, Sarah noted a hole in the living room wall. Drywall was "scattered everywhere." She then went outside and observed a hole in the house's siding on the exterior wall of the living room area. In the dining room, Sarah observed a hole in a

lampshade and "there was a marking on the back wall of [the] dining room." Later, the police found a bullet on the dining room floor.

¶ 15    On cross-examination, Sarah agreed that her house is "at an incline up *** from where the shooting happened." On redirect-examination, she clarified that it was a "slight incline." She added, "We have steps leading up to our house from the sidewalk and then we have a couple steps up to the porch."

¶ 16    The State then called Brent Miller, a firefighter paramedic. Miller testified that, on May 3, 2016, at 6:27 p.m., he was dispatched to the area of Hunt Club Road and Steeplechase Road regarding an assault victim. There, he treated Suzette, who had bruises on her face. Her left eye was "swelled almost completely shut." They transported Suzette to the hospital. On cross-examination, Miller stated that Suzette had not reported that her face had hit the concrete when she had fallen on the sidewalk. He agreed that Suzette's injuries could have been caused in this manner. On redirect-examination, he testified that the injuries could also have been caused by someone grabbing her by the hair and slamming her face into the floor.

¶ 17    The State next called Kristin Grossi. She testified that she is a deputy sheriff for DuPage County. In May 2016, she lived about a block east of Hunt Club Road. On May 3, 2016, she was off duty, at home in a sunroom located at the back of her home. Her yard backed-up to a house on Hunt Club Road. Grossi's husband and three children were also present. At about 6:25 p.m., they heard four or five loud bangs. Her husband called 911. She walked through the backyards toward Hunt Club Road, where she observed defendant sitting on the ground and a man standing next to him. She stated, "The man sitting on the grass had blood on his hands." Grossi thought defendant may have needed help, so she walked over and asked. Defendant, "in a loud, angry voice," said

"no." Grossi asked what had happened, and defendant replied, "I did it." She asked what he meant, and he stated, "I did what I did."

¶ 18    Suzette next testified for the State. She testified that defendant is her ex-husband and that they had married in 1989. On May 3, 2016, they lived at 413 Hunt Club Drive in St. Charles. Hunt Club Drive intersects with Steeplechase Road and Stonehenge Road (the latter two come together at the intersection) a little north of their house. There were guns in the house, but Suzette did not know how many. Some were stored in a gun safe, and one was kept in a kitchen cabinet.

¶ 19    Suzette stated that on May 3, 2016, she believed her marriage to defendant was "solid," though they "had had [their] ups and downs." She stated that there had been "a number of stressors." Suzette had been sick. At the time of the incident at issue in the trial, Suzette was "11 months out after a major operation from cancer." In October 2014, she had been diagnosed with "invasive bladder cancer." Following her diagnosis, Suzette had some minor surgeries. She also underwent two types of chemotherapy. This was a stressful time. Suzette was unable to do the things she normally could do, so defendant took care of them, such as cooking, cleaning, and caring for her. Eventually, in June 2015, a major surgery was performed. The procedure was scheduled for 8 hours and actually took 12 hours due to a complication. At the time of the trial, she was still recovering from the surgery. Following the June 2015 surgery, defendant did all the grocery shopping and cleaning. Suzette's bladder needed to be flushed every two hours, and, for the most part, defendant did this. Defendant's "drinking *** increased tremendously."

¶ 20    Defendant retired in April 2016. This led to money problems. Defendant wanted Suzette to get a job. Defendant began drinking earlier in the day. Further, Suzette would sometimes lend her father money, which he would usually pay back, though sometimes not until months later. Defendant would frequently object to Suzette's father's repayment of money. Sometime prior to

May 3, 2016, Suzette's father over-paid her by about $2500 for a loan. Suzette believed they owed her father this sum.

¶ 21    On May 3, 2016, Suzette went to downtown Chicago by herself after dropping off her daughter at the airport. She returned home around 2 p.m. or 3 p.m. Defendant was present. They exchanged pleasantries. Defendant was drinking wine. Later that afternoon, they became involved in a "verbal altercation" regarding the $2500 Suzette believed was owed to her father. Suzette asked defendant to write a check to her father for that amount. Instead, defendant gave her a check for $2000. Defendant angrily asserted that her father owed them money from past transactions. She acknowledged that her tone was "[p]robably not very nice." Suzette told defendant she disagreed with him, but did not say much because she "decided it wasn't worth a fight with someone who had been drinking." They stopped discussing this subject.

¶ 22    Still later in the afternoon, Fi Mazanke, a friend of Suzette's, came over. They worked on a social media page for Mazanke's business. Defendant spoke with Suzette about dinner, and she noted that his demeanor had changed and "it appeared that he had been drinking a lot more." A while later, Mazanke left.

¶ 23    Suzette went to the kitchen, and defendant was on the porch. Defendant stated that chicken was ready to cook and started the grill. Suzette made a vegetable, and defendant cooked the chicken. Defendant was drinking white wine. They sat down to eat in the family room. Suzette had a portion of a glass of wine as well. Suzette cut into her chicken and saw that it was raw, so she put it in the microwave. She asked defendant if he wanted his microwaved too. He declined, saying his was perfect. Defendant sounded "irritated." Suzette returned to the couch and finished her dinner while they watched television.

¶ 24 Suzette took both of their plates to the kitchen to put in the dishwasher. Defendant followed, stating that she had "better get on board with him." He did not say what she was supposed to "get on board" with. She asked what he meant, and he said, "How about if I beat the shit out of you." Suzette walked toward the telephone, and defendant followed. Defendant stated "[Y]ou're going to call the police" and hit her "with a closed fist on the left side of [her] face." Suzette fell, and defendant took the telephone from her. Suzette was lying on her back. Defendant kneeled on her arm, sat on her abdomen, and punched her in the face. Defendant said that he was going to "beat the shit out of" her and kill her. Defendant stopped punching Suzette, and bounced on her stomach. He hit her a "few more times" and then "took [her] hair like the front of [her] head was a handle and pounded [her] head against" the floor.

¶ 25 Suzette told defendant she loved him and begged for her life. Defendant went to the cabinet where they kept a gun. Suzette got up and went to the garage. She activated the garage door and either "crawled or rolled out." She went to the end of the driveway, where she saw two people—a man and a woman—with a dog. She did not recall falling. She told the people that her husband had gone crazy, beat her, and was trying to kill her. She also stated that he had a gun. Defendant came out of the garage. He grabbed her arm and said that she had fallen. Defendant said she should come into the house and clean up. Suzette started walking toward the woman with the dog. She heard a gunshot, and the woman with the dog fell to the ground. Suzette thought the woman had been shot, and she ran. She heard four or five gunshots in all. Suzette ran to a house down the block and across the intersecting street. No one answered initially, but she then heard the woman with the dog yell to a person in the house that it was okay to let Suzette in. Suzette entered and called 911. The police and paramedics arrived. Suzette was transported to Delnor Hospital, where she remained for three or four days.

¶ 26    On cross-examination, Suzette stated that defendant had brought a gun into the house for protection. She acknowledged that she had previously been the victim of a violent attack, but stated that "that ship had long sailed" and she felt safe in her house. The attack had occurred when she was 20 years' old. Both defendant and Suzette had FOID cards.

¶ 27    Suzette testified that "from time to time" defendant displayed that he was upset because he had to take care of her. She added, "He yelled occasionally." However, she acknowledged that he visited every day when she was in the hospital for her cancer surgery. She believed that defendant loved her. In 27 years of marriage, he had never previously done anything to make her feel unsafe.

¶ 28    Suzette admitted that she did not remember falling when she reached the end of the driveway or slamming into the garage door as she exited the house. She could not explain what the loud thud was that Steven and Diane described in their testimony. Suzette agreed that she did not know what direction defendant was firing in and that she only heard the shots.

¶ 29    Detective Eric Bauwens authenticated a number of photographic images for the State. He also testified that 502 Steeplechase Road (where Suzette ran after the shooting) was elevated about three feet above the sidewalk in front of it. A small circular hole, which could have been a bullet hole, was found about 10 feet up in a tree. The hole appeared fresh. He could not state definitively that the hole was a bullet hole.

¶ 30    Jennifer Larsen, a St. Charles police officer, testified that she was on duty on May 3, 2016. She was dispatched to Hunt Club Road regarding shots being possibly fired. Larsen rode with Suzette in the ambulance to Delnor Hospital. She noted Suzette's injuries. Suzette "was shooken [*sic*] up and wincing in pain." She collected Suzette's clothing, which was blood stained. On cross-examination, she acknowledged that she did not know when the blood was spattered onto the clothing.

¶ 31    Brian Dunleavy, an emergency room doctor, testified that he treated Suzette on May 3, 2016. He described Suzette's injuries. Dunleavy "was informed that she had fallen while she was running." He agreed that falling face-first onto pavement could have caused some of Suzette's injuries.

¶ 32    Roger Anderson testified that he had been a patrol sergeant with the St. Charles Police Department on May 3, 2016. He was the first to arrive at the crime scene. Defendant had already been subdued, and Anderson placed defendant in handcuffs. Defendant had a fresh abrasion on his left wrist. Defendant's demeanor was "relatively calm." A witness directed Anderson to a gun. Anderson recovered the gun—a silver snub-nose revolver. The condition of all five shell casings in the gun indicated that they had been fired.

¶ 33    The State next called Michael Redmann, a St. Charles police officer. He and Officer Runkle were dispatched to the crime scene on May 3, 2016, at about 6:30 p.m. They escorted defendant to their patrol vehicle. Redmann noted an odor of alcohol emanating from defendant. Redmann did not ask defendant any questions; however, defendant, of his own accord, said that he knew why the police were present. Defendant also stated, "I did what I did; I know why you guys are here; it is because of what I did and I understand."

¶ 34    Officer Brett Runkle testified that he responded to the crime scene with Redmann. He escorted defendant to his squad car. While walking to the car, defendant said, "I did what I did." Runkle transported defendant to the booking room. While there, defendant stated, "[Y]ou guys are completely right because I did what I did." He later stated, " I did what I did because she got out of line." Additionally, he said, "I hit her and I tried to shoot her so it's probably a felony." Runkle asked defendant to take a breath test for alcohol, but he refused. On cross-examination, Runkle acknowledged that defendant was polite and respectful.

¶ 35    Richard Sullivan, a forensic investigator for the St. Charles Police Department, was the State's next witness. On May 3, 2016, he inspected a weapon that the St. Charles police had recovered. He identified pictures of the weapon, including one showing that all five shells in it had been expended. He also identified pictures of a bullet hole in the residence at 502 Steeplechase Road. Sullivan testified that a short-barreled gun, such as the one used in here, loses accuracy at longer ranges.

¶ 36    The parties stipulated that a bullet recovered from 502 Steeplechase Road was fired by the gun recovered by the police. The State then rested.

¶ 37    Defendant then testified on his own behalf. He stated that he had grown up around guns and considered himself a very good shot. He and Suzette had been married for 26 years. He believed they had had a good marriage.

¶ 38    Suzette was diagnosed with bladder cancer in 2015. A surgical procedure was performed immediately and Suzette was given chemotherapy. Eventually, Suzette's bladder was removed, and a neobladder was formed with a portion of her intestine. After the surgery, Suzette's activities were limited. Defendant stated that he "did the cleaning, which [he] didn't mind." He cared for Suzette while she recovered, including flushing her bladder every two to three hours. He stated that this "was okay because that's what people do," "[b]ut it was all day, all night." Defendant was not yet retired at this time. In August 2015, "the doctor okayed her for basically all activities."

¶ 39    Defendant then retired. He was getting a small pension and social security, but they had less money coming in. He was happy to retire and thought things were "going very well." He felt that they "had to be very careful on our funds." Defendant testified that Suzette's father had been swindled out of about $850,000. This upset Suzette, because, according to defendant, she was counting on this money for her inheritance. Suzette wanted to make improvements to their home.

Friends wanted them to go on a trip to Europe, which would have cost $10,000; however, defendant declined because they could not afford it. Suzette was upset. Suzette was also having difficulty adjusting to defendant being home all day.

¶ 40    Defendant stated that May 3, 2016, started out as a "great day." He went to get a haircut and to visit his mother. He cut his mother's lawn then returned to his home about 2 p.m. He denied starting to drink when he got home. Suzette got home before 4 p.m., then her friend, Fi, arrived. Defendant got the mail and opened the credit card bill. He left it on the kitchen table for Suzette to review. Defendant testified that the reduction in his income due to retirement was a tough transition. Suzette was used to having "all the money in the world to spend." Defendant declined to characterize it as "angry" or "an argument" when they went through the credit card bill.

¶ 41    Defendant acknowledged that he wrote a check to Suzette's father for only $2000 of the $2500 they owed him. He explained they were going to go on a trip to do business on his behalf, and he wanted to withhold the $500 until after the trip for expenses. Defendant stated he would pay her father any sums remaining after their expenses, but this upset Suzette. This conversation occurred before Fi came by. They often paid for things for Suzette's father, and he would pay them back. He did not always do so in a timely manner.

¶ 42    Fi arrived about 4 p.m. Defendant stated that he had not consumed any alcohol by this point. Fi and Suzette worked together for a while, and then Fi left between 5 p.m. and 5:30 p.m. Defendant started grilling some chicken that he had marinated at about that time. They started eating around 6 p.m. After dinner, defendant opened a bottle of wine and offered Suzette a glass. Prior to this time, defendant testified, he had not been drinking that day.

¶ 43    They finished dinner and started to clean up. Suzette "started nagging [defendant] and yelling at [him] about her dad again." Defendant stated that she "brought up out of the blue about

- 13 -

everything she couldn't do." Suzette was yelling. She was asking how they were paying their bills and where the money was coming from. Suzette, referring to the check for $2000 defendant had written, accused defendant of stealing money from her father. Defendant was yelling back. Suzette pointed her finger at defendant and poked him, stating, "I'm going to do what I want to do and I'm going to do it now." Defendant said she could not because they did not have the money. Suzette threatened to call the police. She said if defendant touched her he would go to jail. She was poking and yelling at him at this point. Suzette started heading toward the telephone. Defendant stated that at this point, he "took her and [he] put her on the floor." Defendant got on top of Suzette and "hit her a few times with [his] right hand." Suzette said defendant was hurting her chest, and he got off her. Suzette got up and walked toward the cabinet where they kept a gun. Defendant thought she was going to shoot him. He explained that Suzette had been violently attacked in the past and had stated that if she had had a gun, she would have killed her attacker. The gun was in the cabinet for Suzette's protection, according to defendant. She wanted it there. Defendant "stepped between her and the cabinet," and Suzette "turned around and walked out the garage door." Defendant heard a thud, and Suzette ran out to the people in the front yard.

¶ 44    Defendant stated that he then grabbed the gun and put it in his pocket so Suzette could not get it. He then went outside to see what was going on. Defendant walked out of the garage door. He testified that he "walked out there calmly, easily." He knew Suzette had fallen. She was prone to falling, defendant explained, because she has "a lazy foot or a drop toe." Suzette had stood back up by the time defendant got outside. Suzette was with Steven, and Diane was nearby. Defendant approached and asked Suzette to come back inside and clean up. Defendant touched Suzette's arm, and she turned and walked away. Defendant denied wanting to kill Suzette. He wanted her to come back, and he knew they would have to call the police.

¶ 45    When Suzette started walking away, defendant was angered. He "took the gun and [he] fired up in the air." Defendant explained that he has a rotator cuff injury, so he is limited as to how far he can lift his arm. He did not want to hurt anyone. Steven hit defendant's arm and then jumped on his back. A number of neighbors gathered around. Some said he had killed his wife. One neighbor, Dan, was near where the gun was. Defendant told Dan to stay by the gun and then asked Steven to get off him, as he was not doing anything. Defendant characterized his demeanor as "calm." Defendant remained sitting on the ground until the police came and handcuffed him. The police took defendant to a squad car. Defendant was transported to a booking area in the police station. He became concerned regarding the charges he was facing, as the neighbors that had gathered were saying he killed his wife. He asked what the charges would be. Finally, defendant stated that he felt bad about hitting his wife. He also reiterated that he was not aiming at anyone when he fired the gun.

¶ 46    On cross-examination, defendant denied that he had been drinking, but clarified that he had had "a drink of wine with [his] wife." Defendant stated that he thought he saw Suzette fall at the end of the driveway. Defendant estimated that his arm was pointed more than 45 degrees off the ground when he shot. Defendant explained that when he put Suzette on the floor in the house, he did so by grabbing her by the shoulders.

¶ 47    The jury acquitted defendant of attempted murder and convicted him of aggravated discharge of a firearm (regarding Suzette), reckless discharge of a firearm (regarding Diane), and one count of aggravated domestic battery. The matter proceeded to a sentencing hearing.

¶ 48    At the sentencing hearing, the State first called Roger Anderson, previously of the St. Charles Police Department. When he arrived at the crime scene, he saw defendant sitting on the sidewalk. Anderson handcuffed defendant. Anderson asked defendant, "Why am I here?"

Defendant replied, "I just shot my wife." Defendant was "oriented" but "spacey looking." On cross-examination, Anderson acknowledged that defendant had not, in fact, shot his wife.

¶ 49    The State then called Officer Nicholas Anson. When he arrived at the scene, Anderson was already present. Defendant was handcuffed and sitting on the ground. He heard defendant say "I just shot my wife" as he approached. Defendant appeared calm.

¶ 50    Christine Gabnay then testified for the State. Gabnay had been married to defendant from 1976 to 1984. They dated for about seven years prior to the marriage. While they were dating, defendant kicked Gabnay out of a car because he was upset, injuring her neck. During the marriage, Gabnay bought a new blouse. Defendant became upset and ripped the blouse and her bra off and then locked her in the bathroom for an hour and a half. Defendant then screamed and yelled at Gabnay through the door while she cried. On another occasion, they were in the kitchen and defendant became angry. He pushed Gabnay to the ground, kneeled on her chest, and choked her until she "just about blacked out." Defendant "had a crazy look in his eye like he didn't care" and was "still screaming, ranting." When Gabnay brought up divorce, defendant threatened to kill her and their children. On cross-examination, Gabnay admitted using marijuana during her marriage to defendant. She denied having "had any problems with drugs throughout the years." She also admitted having an affair with a neighbor. Gabnay denied that her children were taken from her because she used marijuana and cocaine and because she left them unattended.

¶ 51    The State then called Suzette. She addressed issues pertaining to restitution. She then read her victim-impact statement.

¶ 52    Defendant then called Kellie Turyna. She is defendant's niece. She testified that she had a close relationship with defendant. Defendant taught Kellie how to shoot. Defendant was a good shot and "didn't miss a target." Defendant was "very affectionate" to Suzette. He was "very

helpful, and he took care of most of the chores." She never heard defendant insult Suzette. Suzette was often frustrated with defendant. However, when she confronted him over such things, he remained calm. Kellie stated that she "never even heard him raise his voice."

¶ 53    Kellie testified that she knew Christine Gabnay. Christine was a friend of her mother. Christine would spend time at their house, drinking and using "lots of cocaine." Defendant loved and spoiled his daughter, Jackie. He was involved in raising her. Defendant often played the role of peace maker in family squabbles. On cross-examination, Kellie acknowledged that she typically had interacted with defendant and Suzette about once per month.

¶ 54    Roger Anderson was then recalled, and the State stipulated that defendant made a statement while in custody that he was not trying to shoot anyone.

¶ 55    Defendant then called Joyce Turyna, his mother. She testified that defendant is a "good man." Joyce has two living sons, including defendant. Her other son had an accident in which he sustained a "slight brain injury." He is unable to work; she cares for him. Her husband is deceased. Joyce stated that her health is "quite poor." Joyce testified that she was 86 years old. When her husband died, defendant "took over." Joyce stated that she loves Suzette and had a "very good relationship with her."

¶ 56    Joyce has never known defendant to be a violent person. She was "devasted [and] shocked" when she heard about the crime. For five or six weeks, defendant came over every day, and they "would sit and cry together." Defendant was remorseful. Joyce knew Christine Gabnay and had never heard of any violence in defendant's relationship with her. She believed defendant and Suzette had a happy marriage. Defendant was an affectionate person.

¶ 57    Defendant made a statement in allocution, and then the trial court pronounced its sentence. In mitigation, the trial court found that defendant had led a law-abiding life prior to the commission

of the instant offenses. It also found that defendant would likely comply with a period of probation. In aggravation, the trial court found that the counts based on discharging a firearm did threaten serious physical harm and that "a sentence is necessary to deter others from committing the same crime." As a nonstatutory factor, the trial court noted the victim's medical condition and the fact that defendant was aware of it. It noted that despite the jury acquitting defendant on the attempted murder count, defendant did fire a weapon five times in his wife's direction. It observed that in the presentence report, defendant is quoted as saying Suzette's physical health was a difficult issue for her and it changed her mentally. She yelled a lot and was always complaining. Further, defendant stated, he was "fed up with the mean and nasty [and] I hit her." The trial court continued, "[B]ecause she was hurting and complaining, *** he was fed up, so he hit her." It added, "It bothers him, he strikes." The trial court noted defendant's level of alcohol consumption. Until his allocution, defendant never expressed remorse for his actions. The trial court found that defendant's actions threatened others in the neighborhood, including Sarah, remarking, "And I highly doubt she's ever able to sit there another day since May 3rd of that year *** and think she's safe[,] [w]hen is the next whacko going to pull a trigger in her neighborhood." The trial court found that a period of imprisonment was necessary for the protection of the public, so probation was not appropriate. It also found that a sentence of probation would deprecate the seriousness of the offenses. It stated that violence was not tolerated in "this courtroom" or Kane County.

¶ 58    The trial court then found consecutive sentences were mandatory. It found that "severe bodily injury occurred in relation to the aggravated domestic battery." It then found the offenses occurred in a single course of conduct. There was no break in the conduct simply because defendant "decided to go grab a gun." It then found that aggravated discharge of a firearm constituted a "triggering offense" for mandatory consecutive sentencing. The trial court then

sentenced defendant to 2 years' imprisonment for the reckless discharge of a firearm count to run concurrently with the other two convictions; 5 years for aggravated domestic battery; and 12 years for the aggravated discharge of a firearm count—the latter sentences to run consecutively. In denying defendant's motion to reconsider, the trial court clarified that it considered consecutive sentences mandatory and it was not exercising any discretion on this issue.

¶ 59    Defendant now appeals.

¶ 60                                 III. ANALYSIS

¶ 61    On appeal, defendant raises two main issues. First, he contends that the trial court erred in concluding that consecutive sentences were mandatory in this case. Second, he challenges his sentence, arguing that it was an abuse of discretion and that the trial court relied on improper aggravating factors. We now address these issues.

¶ 62                            A. Consecutive Sentences.

¶ 63    Defendant first argues that the trial court misconstrued section 5-8-4(d)(1) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(d)(1) (West 2016)) as mandating consecutive sentences in the instant case. That section requires a court to impose consecutive sentences where "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." *Id.* Statutory construction presents a question of law subject to *de novo* review. *People v. Gonzalez*, 388 Ill. App. 3d 1003, 1005 (2009).

¶ 64    The issue here is what it means that the infliction of "severe bodily injury" must occur during the course of the offense that triggers the application of this statute. Here, aggravated discharge of a firearm—a Class 1 felony (720 ILCS 5/24-1.2 (West 2016))—is the triggering offense. Aggravated domestic battery is a Class 2 felony (720 ILCS 5/12-3.3 (West 2016)), and so

it is not the triggering offense. As set forth above, Suzette's injuries resulted from the aggravated domestic battery rather than the aggravated discharge of a firearm.

¶ 65    Generally, our role in interpreting a statute is to ascertain and give effect to the legislature's intent, which is best evidenced by the statute's plain language. *People v. Olsson*, 335 Ill. App. 3d 372, 374 (2002). Only where a statute is ambiguous may a court turn to extrinsic aids of construction. *Id.* One such principle of construction, known as the rule of lenity, requires that an ambiguous criminal statute must be construed in a defendant's favor. *People v. Whitney*, 188 Ill. 2d 91, 98-99 (1999); see also *People v. Carlock*, 102 Ill. App. 3d 1100, 1102 (1981) (noting that an enhanced statutory penalty is "highly penal and should not be extended in its application to cases which do not, by the strictest construction fall, within its terms").

¶ 66    The version of the section 5-8-4 in effect here provides, in pertinent part, as follows:

> "(d) Consecutive terms; mandatory. The court shall impose consecutive sentences in each of the following circumstances:
>
> > (1) One of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2012).

In *Whitney*, 188 Ill. 2d 91, our supreme court squarely addressed the issue of whether this provision requires that "severe bodily injury" occur during the triggering offense to make consecutive sentences mandatory. *Id.* at 98-99.

¶ 67    The court in *Whitney* considered a prior version of the same statute, which was then section 5-8-4(a) of the Code (730 ILCS 5/5-8-4(a) (West 1994)). At that time, the statute provided, in relevant part, as follows:

> "The court shall not impose consecutive sentences for offenses which were committed as

part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, *one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury*, *** in which event the court shall enter sentences to run consecutively." (Emphasis added.) *Whitney*, 188 Ill. 2d at 95 (quoting 730 ILCS 5/5-8-4(a) (West 1994)).

The current version of this statute has been renumbered and includes first-degree murder as a triggering offense. *Compare* 730 ILCS 5/5-8-4(a) (West 1994) *with* 730 ILCS 5/5-8-4(d)(1) (West 2016). However, the key italicized language is substantively identical to the language of the current version of the statute, again, save for the addition of murder as a triggering offense.

¶ 68    In *Whitney*, the defendant and an accomplice fired a weapon into an automobile. 188 Ill. 2d at 92-93. The projectile struck and killed one of the car's occupants, but the other occupant was unharmed. *Id.* at 93. The defendant was convicted of first degree murder regarding the former victim and aggravated discharge of a firearm regarding the latter victim. *Id.* Under the version of the statute that controlled at the time, murder was *not* a triggering offense. *Id.* at 93-99. Thus, the *Whitney* court addressed the question of "whether the Class X or Class 1 felony must involve the infliction of severe bodily injury to the victim *of that felony* to trigger mandatory consecutive sentences under section 5-8-4(a)." (Emphasis added.) *Id.* at 96

¶ 69    The court began its analysis by finding that the statute was ambiguous with respect to whether severe bodily injury had to be inflicted during the course of the triggering offense:

"Applying these principles, we find that the first exception is ambiguous because it is susceptible to two equally reasonable and conflicting interpretations. Both the interpretation advanced by the State and the interpretation advanced by defendant are reasonable. As noted by the State, there is no specific reference tying the requirement of

severe bodily injury to the Class X or Class 1 felony. Nonetheless, it is reasonable to associate the severe bodily injury with the Class X or Class 1 felony given its inclusion in the same exception [to concurrent sentencing]." *Id.* at 98.

The *Whitney* court further noted that the statute's legislative history did not resolve the ambiguity. *Id.* The court then concluded that the ambiguity had to be strictly resolved in the defendant's favor, as under the rule of lenity, as again, "[a]ny ambiguity in a penal statute should be construed and resolved in favor of the defendant." *Id.* at 98-99. Thus, the *Whitney* court held, that consecutive sentencing was required only "where the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury *during the commission of that felony*." (Emphasis added.) *Id.* at 98-99.

¶ 70    Naturally, "the purpose of the mandatory consecutive sentencing provision *** is to punish the commission of triggering offenses"—*e.g.*, those higher level felonies in which the defendant has inflicted severe bodily injury—"more harshly than the commission of non[-] triggering ones." *People v. Curry*, 178 Ill. 2d 509, 539 (1997). This court had little difficulty in applying *Whitney* in a case remanded for reconsideration in light of its holding, where we determined that the defendant's sentence for a non-triggering offense could not be mandatorily consecutive to his triggering offenses. See *People v. Durham*, 312 Ill. App. 3d 413, 421 (2000) (noting that under *Whitney*, "the required severe bodily injury must be inflicted during the commission of the Class X or Class 1 felony"). Conversely, we have also remanded cases for the imposition of mandatory consecutive sentences under *Whitney* where severe bodily injury was plainly inflicted during the commission of a triggering offense. See, *e.g.*, *People v. Hauschild*, 364 Ill. App. 3d 202, 228 (2006), *aff'd in part*, *rev'd in part on other grounds*, 226 Ill. 2d 63.

¶ 71    The State contends, however, that *Whitney* is not controlling here and that the statute is "unambiguous." The State primarily points out that *Whitney* construed an earlier version of the statute; however, as noted above, the language at issue is identical in all material aspects (the only changes being the addition of murder as a triggering offense and a renumbering of the subsection). We, of course, cannot and will not disregard precedent from our supreme court. *Whitney* holds that the statutory language *is* ambiguous and we find the State's argument to the contrary unpersuasive.

¶ 72    The State also asserts that we should consider two post-*Whitney* decisions from the First District Appellate Court—*People v. Sample*, 326 Ill. App. 3d 914 (2001), and *People v. Thompson*, 331 Ill. App. 3d 948 (2002)—as warranting a different result. The State notes that these two cases employed what has become known as the "essentially simultaneous test"—that is, in both cases, panels in the First District concluded that the *Whitney* standard mandating consecutive sentences was met where commission of the triggering offense and the infliction of serious bodily injury through a non-triggering offense occurred "essentially simultaneously." *E.g.*, *Sample*, 326 Ill. App. at 927-28 (shooting victim during home invasion); *Thompson*, 331 Ill. App. 3d at 956-57 (shooting victim during armed robbery); see also *People v. Harris*, 2013 IL App (1st) 120498, ¶ 37 (shooting victim during carjacking).

¶ 73    The State's reliance on these First District cases is misplaced as they are readily distinguishable. Here, there was no dispute that defendant inflicted serious bodily injury during the commission of aggravated domestic battery to Suzette, a non-triggering offense, inside their home. Defendant finished beating Suzette before walking to the gun cabinet and retrieving a handgun. Then, defendant followed Suzette, was confronted by Spurling, and committed aggravated discharge of a firearm, the triggering offense, when he shot at Suzette outside of the house. Thus, although defendant's beating of Suzette and the discharge of a firearm in her direction

*might* have had the common criminal objective of severely injuring or even killing her, Suzette's injuries from the non-triggering offense occurred *before* the commission of the triggering offense of aggravated discharge of a firearm. Accordingly, we agree with defendant that these were two distinct offenses, which occurred in distinct places. That is, these crimes occurred sequentially rather than "essentially simultaneously." See also *People v. Barajas*, 322 Ill. App. 3d 541, 557 (2001) (reversing mandatory consecutive sentences under *Whitney* where defendant's "two counts of aggravated discharge did not result in severe bodily harm to the victims of those [non-triggering] felonies").

¶ 74    In sum, under *Whitney*, we hold that consecutive sentences were not mandatory in this case. We therefore vacate the portion of the trial court's order imposing consecutive sentences and remand so that the trial court may consider whether to impose such sentences as a matter of its discretion.

¶ 75                              B. Defendant's Additional Sentencing Challenges.

¶ 76    Defendant presents additional attacks to the trial court's sentence. He argues that the trial court misconstrued evidence; relied on improper factors in aggravation; and imposed an aggregate sentence of 17 years' imprisonment on a senior citizen with no prior criminal history. Defendant also points out that a risk-assessment instrument indicated that he was at minimal risk to reoffend. The State responds that defendant's 17-year sentence was appropriate.

¶ 77    Generally, we will disturb a sentencing decision of the trial court only if it constitutes an abuse of the trial court's discretion. *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. We may find an abuse of discretion only if no reasonable person could agree with the trial court's decision. *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 28. A trial court abuses its discretion "only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly

disproportionate to the nature of the offense." *Id.* "A trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation." *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2003). However, "the question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*." *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 78    Defendant first argues that the trial court erred when it considered Suzette's medical condition as a non-statutory factor in aggravation. Defendant asserts:

> " 'According to the court, [defendant] 'knew the condition [Suzette] was in.' The court asserted that [defendant] 'obviously knew of her medical condition before that.' The court characterized Suzette as [a] '[l]ady with cancer' and [a] 'lady who has to have help going to the bathroom.' The court opined that [defendant] hit her because he was 'fed up' because Suzette was 'hurting and complaining.' 'It bothers him, he strikes.' "

Defendant then points out that Suzette had been cancer free for 11 months at the time defendant committed the offenses. Shortly before the attack, Suzette had taken a trip to New Jersey to help her father rebuild his house. On the day of the assault, she drove to Chicago by herself. At the time defendant attacked her, Suzette was cleaning up after dinner. Thus, defendant reasons, she was not in "such a deteriorated medical condition on the date of the offenses so as to warrant her condition being considered to be a non-statutory factor in aggravation." Rather, on the date of the offenses, according to Suzette's testimony, the conflict between defendant and her was about money.

¶ 79    While we agree that a dispute over money was the immediate catalyst for the assault, we cannot find that the trial court abused its discretion in considering Suzette's medical condition as an aggravating factor. We review the result to which the trial court came rather than its reasoning. *People v. Nash*, 173 Ill. 2d 423, 432 (1996). A reasonable person could conclude that defendant

used his knowledge of Suzette's medical condition to cause further harm to her. In his testimony, defendant described the complications that occurred during Suzette's surgery because "her stomach muscles would not re-attach right." Suzette testified that during the attack, defendant bounced on her stomach and asked her how it felt. Of course, this was the area where she had surgery. This demonstrates an arguable nexus between defendant's knowledge of Suzette's condition and his behavior during the attack. The State also points out that in the presentence investigation (PSI) report, defendant stated that Suzette's physical health had changed her and that "he was 'fed up with the mean and nasty [and] I hit her." As a reasonable person could arrive at the conclusion that defendant used his knowledge of Suzette's injuries to cause her further pain, we determine that no abuse of discretion occurred. See *Lawson*, 2018 IL App (4th) 170105, ¶ 28.

¶ 80    Defendant further complains about the trial court's comments that he blamed the victim. However, the PSI states that defendant spoke of his wife's behavior, calling it "mean and nasty." At trial, defendant testified that prior to his attack, Suzette was "nagging" him. Thus, the trial court's comments have a firm basis in the record. The trial court also noted that defendant did not express remorse prior to the sentencing hearing, and that defendant expressed no remorse during the PSI. Defendant asserts that sentencing is the time to express remorse. As we read the trial court's ruling, it did credit defendant with apologizing to Suzette at the sentencing hearing while it also considered the fact that defendant did not express remorse prior to the hearing. Both propositions are grounded in the record.

¶ 81    Defendant also criticizes the trial judge for stating that Sarah McWeeney likely had not been able to sit in her house and feel safe since the incident and that she would wonder when the "next whacko" would "pull a trigger in her neighborhood." While this statement may have been unnecessarily hyperbolic, there was substantial evidence in the record from which the trial court

could draw such an inference. First, Sarah described cautiously approaching her front door while Suzette banged on it because she did not know if it was safe. She did not let Suzette in until reassured by Diane. Later, Sarah described bullet holes in her house and drywall scattered throughout the living room. It is true, as defendant points out, that a sentencing judge may not rely on speculation in crafting a sentence. *People v. Zapata*, 347 Ill. App. 3d 956, 964 (2004). However, these facts reasonably show that a person in Sarah's position would experience significant and lasting fear.

¶ 82    Defendant also asserts that the trial judge's reference to a "next whacko" implies that defendant was the first "whacko." We note that "[a]n isolated remark made in passing, even though improper, does not necessarily require that [the] defendant be resentenced." *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). Moreover, "[i]n determining the correctness of a sentence, the reviewing court should not focus on a few words or statements made by the trial court, but it is to consider the record as a whole." *People v. Fort*, 229 Ill. App. 3d 336, 340 (1992). Here, the trial judge did not dwell on defendant's mental state. Rather, the use of the term "whacko" was an isolated—albeit flippant—comment; it does not provide cause for us to disturb defendant's sentence. See *People v. Blanck*, 263 Ill. App. 3d 224, 232-33 (1994) (noting that a judge's " 'offhand, flippant remark,' " did not establish that the trial judge would be unable to act fairly).

¶ 83    Defendant attempts to equate the trial judge's statements that violence is not tolerated in his courtroom or in Kane County with a personal sentencing policy. It is improper to base a sentence on a personal policy of the trial judge. See *People v. Scott*, 2015 IL App (4th) 130222, ¶ 46. Again, this appears more an offhand remark than evidence of such a policy. Significantly, we note that the trial judge found that the fact that defendant's behavior caused or threatened serious harm did not apply to the domestic violence count (it was inherent in the offense the way

the offense was charged (see *People v. Strickland*, 283 Ill. App. 3d 319, 325 (1996))). Violence and causing or threatening harm are closely related. We find unpersuasive the notion that the trial court would impose a greater sentence based on the violent nature of defendant's acts when it refrained from doing so based on causing or threatening harm where it would have been inappropriate to do so.

¶ 84    Finally, defendant asserts that his aggregate 17-year sentence was excessive and an abuse of discretion. Although the State responds to the argument on its own terms, we note that it would be inappropriate for us to consider it that way. Our supreme court has stated that each conviction results in a discrete sentence that must be assessed individually. *People v. Carney*, 196 Ill. 2d 518, 530 (2001). As such, consecutive sentences do not constitute a single sentence and cannot be combined, or attacked, as though they were one sentence for one offense. *Id.* Nevertheless, we will address defendant's challenge as claiming that his 12-year sentence was excessive for aggravated discharge of a firearm, and that his five-year sentence was excessive for aggravated domestic battery.

¶ 85    Defendant points out that a number of mitigating factors are applicable to him. Specifically, he was a 65-year old senior citizen with no criminal history. An actuarial instrument placed him at a low risk to reoffend. The trial court found that defendant was likely to comply with probation if such a sentence were imposed. However, there were also a number of aggravating factors identified by the trial court. It found that defendant's conduct of discharging a firearm threatened serious physical harm. It also found that a sentence was necessary to deter others from committing a similar crime. As noted, it found that defendant's knowledge of the victim's medical condition was an aggravating factor, specifically noting that defendant jumped on the victim's stomach. Despite the jury's acquittal of defendant on the attempted murder count, the trial court found by a

preponderance of the evidence that the underlying conduct occurred and considered it as an aggravating factor. See *People v. Robinson*, 286 Ill. App. 3d 903, 910 (1997) ("Evidence of other criminal conduct is admissible at sentencing, even though a defendant has previously been acquitted of that conduct."). The court noted defendant's failure to express remorse during the PSI. The trial court also found that probation was inappropriate as imprisonment was necessary to protect the public and probation would deprecate the seriousness of the offenses. Thus, while there were significant mitigating factors, there were also significant aggravating factors, and, in fact, more of the latter. Under such circumstances, we agree with the trial court that a substantial sentence was appropriate.

¶ 86    Finally, where a sentence is within the statutory limits, we may not disturb it absent an abuse of discretion. *People v. Coleman,* 166 Ill. 2d 247, 258 (1995). Here, defendant faced maximum potential sentences of up to 15 years for aggravated discharge of a firearm, and up to seven years for aggravated domestic battery. Accordingly, defendant's 12-year and five-year sentences were well within statutory limits. They were not the harshest possible sentences he could have received, and they were not an abuse of the trial court's discretion.

¶ 87                                    IV. CONCLUSION

¶ 88    In light of the foregoing, we vacate that portion of the trial court's order mandating consecutive sentences, and remand so the trial court may consider the issue of discretionary consecutive sentencing. In all other respects, defendant's convictions and sentences are affirmed.

¶ 89    Vacated in part and affirmed in part; cause remanded.