2023 IL App (2d) 210095-U
No. 2-21-0095
Order filed February 23, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-383 |
| ANGELA J. VARRIALE YELM, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice McLaren and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1  *Held*:  (1) The trial court's finding that the wounds inflicted upon the victim by defendant constituted "severe bodily injury," thereby triggering the requirement of consecutive sentences, was not against the manifest weight of the evidence; (2) defendant's claim that the trial court improperly determined that her conduct resulted in "great bodily harm to a victim," thereby triggering the requirement that defendant serve 85% of her sentence, is forfeited and not reviewable as plain error or ineffective assistance of trial counsel; (3) defendant's claim that the trial court improperly determined that no statutory factors in mitigation applied is forfeited and not reviewable as plain error or ineffective assistance of trial counsel; and (4) defendant's claims that her sentences for home invasion, armed violence, and aggravated domestic battery were excessive are forfeited and not reviewable as plain error or ineffective assistance of trial counsel.

¶ 2       Following a jury trial in the circuit court of Kendall County, defendant, Angela J. Varriale Yelm, was convicted of two counts of home invasion, one count of armed violence, and one count of aggravated domestic battery. The trial court merged the two home-invasion counts and sentenced defendant to 20 years' imprisonment for home invasion, 18 years' imprisonment for armed violence, and 5 years' imprisonment for aggravated domestic battery. The trial court determined that defendant inflicted "severe bodily injury" and that her conduct resulted in "great bodily harm to a victim." Based on these findings, the court determined that defendant's sentences were required to run consecutively (see 730 ILCS 5/5-8-4(d)(1) (West 2016)) and that defendant would be required to serve at least 85% of her sentence pursuant to the truth-in-sentencing law (see 730 ILCS 5/3-6-3(a)(2)(iii), (vii) (West 2016)). On appeal, defendant challenges the trial court's imposition of consecutive sentences and its finding that she must serve 85% of her sentence. Defendant also argues that the trial court erred at sentencing because it refused to give weight to the applicable statutory factors in mitigation and that the sentences imposed were excessive. We affirm.

¶ 3                                I. BACKGROUND

¶ 4       Defendant's convictions stem from an encounter involving her, Jesee Janes, Ashley Kelly, and Brittany Vizzini on November 27, 2017. Defendant was initially charged by information with various offenses related to the encounter. On December 19, 2017, a grand jury returned an 11-count indictment against defendant. Counts I through IV of the indictment charged defendant with home invasion (720 ILCS 5/19-6(a)(1), (a)(2) (West 2016)). Count V charged defendant with aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2016)). Count VI charged defendant with aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2016)). Count VII charged defendant with criminal trespass to a residence (720 ILCS 5/19-4(a)(2) (West 2016)). Counts VIII and IX

charged defendant with armed violence with a Category II weapon (720 ILCS 5/33A-2(a), 33A-3(a-5) (West 2016)). Counts X and XI charged defendant with attempt (first-degree murder) (720 ILCS 5/8-4(a), 9-1 (West 2016)). Prior to trial, the court granted the State's motion to *nolle pros* two counts of home invasion (counts I and II) and the counts charging aggravated battery (count VI) and criminal trespass to a residence (count VII). On November 16, 2020, the matter proceeded to a jury trial on the remaining charges. The following evidence relevant to this appeal was presented at defendant's trial.

¶ 5     Janes testified that he met defendant in 2015 and dated her on and off during 2016 and 2017. During their relationship, Janes and defendant co-owned two cars, a red Dodge Charger and a white Dodge Charger. In the summer of 2017, after Janes and defendant broke up, he began dating Kelly.

¶ 6     Kelly resided in a condominium at 2700 Light Road in Oswego. Kelly's condominium consists of a living room, a kitchen, a dining room, a bedroom, a bathroom, and a utility closet. The front door of the condominium is located behind an exterior stairwell. To the right of the stairwell, there is a sliding door which enters into the living room. To the right of the sliding door, there is a window to the bedroom. The bedroom window is 2½-3 feet off of the ground and, in November 2017, it did not have a screen.

¶ 7     Although Kelly lived alone, she often had people stay with her. Over the night from November 26 to November 27, 2017, Janes was staying at Kelly's condominium. Vizzini, a friend of Janes and Kelly, was also spending the night at Kelly's place. Kelly also had two dogs—a German Shepard and an Akita.

¶ 8     Janes testified that on the night of November 26, 2017, he and Kelly went to bed in the condominium's only bedroom. The bedroom window was open. In the early morning hours of

November 27, Janes woke up to Kelly's dogs barking. He then heard a female voice, which he identified as defendant's, yelling outside and banging on the exterior of Kelly's condominium. According to Janes, defendant was screaming his name. Hoping defendant would leave, Janes and Kelly stayed in bed and "act[ed] like [they] weren't home." At some point, defendant entered the bedroom through the window. Janes testified that defendant was dressed in a Wonder Woman costume. When defendant entered, she said, "I'm Wonder Woman bitch." Defendant then asked for the keys to the white Dodge Charger. Although the vehicle was in the condominium parking lot, Janes testified that he had no intention of giving defendant the keys. Instead, Janes lied and told defendant that the car was at his sister's house.

¶ 9      Janes further testified that when defendant entered the bedroom, she had a metal rod in her hands. Janes saw defendant hit Kelly with the metal rod, but she did not hit Janes because he used a box fan that was in the bedroom as a shield to protect himself. Janes observed Kelly take the rod from defendant and throw it out the window. Defendant then pulled out a box cutter, prompting Janes to yell for Kelly and Vizzini to leave and call the police. At that point, Janes began a struggle with defendant. Janes testified that every time he tried to get the box cutter from defendant, she stabbed or slashed him. Janes described the slashes as "forceful." Janes was not able to grab the box cutter away from defendant. Eventually, they moved out of the bedroom and through the living room to an area by the front door. Janes grabbed defendant's arms, pinned her to the wall, headbutted her, and punched her in the face. Janes then slammed defendant to the ground in front of the doorway. Janes testified that the punch he landed caused defendant to bleed. Janes held defendant down until the police arrived. Defendant did not release the box cutter until the police kicked it out of her hand.

¶ 10     Janes testified that as a result of the attack, he suffered injuries to his right shoulder, left chest area, right arm, left arm, and left armpit. Janes refused help from an ambulance, stating that he "really didn't think [he] needed stitches at the time." Less than an hour later, however, Kelly, accompanied by Vizzini, drove Janes to the hospital. Janes initially stated that he did not remember how many stitches he received. He later indicated that he thought he had "80 something stitches all together." He noted that photographs taken of him in Kelly's condominium before going to the hospital and photographs taken of him in the hospital, all of which were admitted into evidence, were accurate depictions of the injuries he sustained during the encounter and the stitches he received. Janes denied that he, Kelly, and Vizzini came up with a plan to frame defendant during the ride to the hospital.

¶ 11     Janes testified that he was also injured after previous altercations with defendant. He described those incidents as having taken place about a month before the encounter on November 27. One prior incident involved defendant cutting Janes with a knife. Another involved her cutting him with a broken beer bottle. Janes also described an incident in which defendant chased him down the street and stabbed the seats of his car with a kitchen knife. Janes testified that after the first incident involving the knife, he went to the hospital to get stitches. The police came to the hospital and questioned Janes. To protect defendant, Janes lied to the police about how he got the injuries. The police were also contacted in relation to the incident in which defendant cut him with the broken beer bottle, but Janes lied about that incident as well.

¶ 12     Kelly's testimony was similar to that of Janes. According to Kelly, over the night from November 26 to November 27, 2017, Janes and Vizzini were staying at her condominium. Kelly and Janes slept in the bedroom. Kelly had the bedroom window open a few inches to alleviate the stuffiness. Kelly awoke to her dogs barking and a female outside screaming and banging near the

bedroom window. Kelly testified that the woman was yelling obscenities and threats at Janes, asking him to give her keys to a car. Kelly got up and went to the living room to make sure that the front door and the sliding door were locked. When Kelly returned to the bedroom, Janes was "under the covers, half awake *** not wanting to really deal with the situation." Kelly then noticed a woman, who she identified as defendant, run towards the bedroom window. Kelly told defendant that she was not allowed there and to get away from her house. At that point, defendant grabbed the side of the bedroom window, slid it, and entered the bedroom. Kelly noted that defendant was dressed in a Wonder Woman costume. Defendant then began yelling obscenities and swinging a metal pole. Defendant hit Kelly at least two times with the metal pole. Kelly twisted the metal pole out of defendant's hands and threw it out of the window. Janes attempted to separate defendant and Kelly. Kelly then heard a "click" and saw defendant swinging her arm violently. Janes told Kelly to get out of the condominium. Kelly and Vizzini got the dogs, went outside, and called 911.

¶ 13    Once outside, Kelly could not see exactly what was going on, but heard defendant threatening to kill Janes and noticed movement in the living room. Kelly next saw Janes and defendant at the condominium's front door, where defendant was swinging at Janes. Janes grabbed defendant's arms and pinned her to the ground, face down. When the police arrived, they kicked a "knife" out of defendant's hand and separated defendant and Janes. Kelly testified that Janes had been "sliced *** all the way down his chest." She also observed "slices" on Janes's arms. At that time, Janes was not "bleeding bad[ly]" but had "open wounds." In addition to a welt from the pole, Kelly testified that she received cuts to her finger and rib area during the incident. After the police left, Kelly, accompanied by Vizzini, drove Janes to the hospital. Kelly testified that the trio did not talk about anything specific in the car, but she noted that Janes was "bleeding all over" and "screaming a lot that he was in pain."

¶ 14    Kelly testified that she knew that Janes had been in a relationship with defendant before his relationship with her. Kelly testified that prior to the incident, she met defendant on one occasion when Janes went to the house he previously shared with defendant to pick up his belongings. After meeting defendant, Kelly began receiving communications from her via Facebook messenger, text, and voicemail. Kelly recalled that on October 18, 2017, she received a voicemail from defendant in which defendant told Kelly to stay away from Janes and threatened to stab Kelly and slit her throat. The voicemail was played in open court. Around the time defendant left the voicemail, Kelly noticed that Janes had several cuts on his arms.

¶ 15    Vizzini testified that on the night from November 26 to November 27, 2017, she was staying at Kelly's condominium. Vizzini slept on the living room couch. In the early morning hours of November 27, Vizzini awoke to a female screaming outside and banging on the side of the condominium building. Kelly, who had been in the bedroom, entered the living room and told Vizzini to stay quiet in the hopes that the woman would go away. After Kelly returned to the bedroom, Vizzini heard the sounds of an altercation. Vizzini heard Kelly say "what the f**k are you doing in my house." Vizzini then saw Janes and a female dressed in a Wonder Woman costume "altercating" through the living room. According to Vizzini, the woman was carrying something that was "sharp." Vizzini and Kelly left the condominium and called 911. The 911 call was played for the jury. In the call, Vizzini informed the 911 dispatcher that a white female in a Wonder Woman costume broke into unit 108 at 2700 Light Road. Vizzini further stated that the woman may have stabbed people when she came inside, that her friend was holding the woman down, and that the weapon was out of the woman's hands.

¶ 16    Deputy John Cady of the Kendall County Sheriff's Office testified that during the early morning hours of November 27, 2017, he was on patrol duty with Deputy Marshal Savitski. At

approximately 3:44 a.m., Cady and Savitski were dispatched to a possible stabbing at an apartment building on Light Road. When Cady arrived, he saw two females standing outside with a German Shepard pointing to a stairwell. Near the stairwell, Cady observed a man restraining a woman. The woman was face down in a "quasi fetal position." The woman was yelling and had a box cutter in her right hand. Cady ordered the woman to drop the weapon. The woman initially refused to let go of the box cutter, so Cady stepped on the back side of her hand at the wrist so that she could not pull it up. Cady then reiterated his command. The woman eventually released the box cutter, and Cady kicked it under the stairs. Cady then ordered the man to let go of the woman. Cady observed that the man, who was not wearing a shirt, had "a lot of blood" on his torso and arms. Cady testified that the woman, who was dressed in a Wonder Woman costume, had "a lot of blood" on her face. Cady also noticed that the woman's left eye and cheek were swollen and she had a laceration between one of her eyelids and eyebrow. The woman refused medical treatment, and Savitski took her into custody. Cady testified that although the woman was not slurring, she had "the distinct odor of alcohol coming from her breath while she was speaking." In court, Cady identified defendant as the woman involved in the altercation.

¶ 17    Deputy Michael Denyko of the Kendall County Sheriff's Office collected items from the scene. Outside the front door of the condominium, Denyko collected a knit hat, an electric soldering gun, a key on a key fob, and a yellow and black utility knife with a three-inch blade. Outside of the bedroom window, Denyko found a metal pipe. Denyko did not observe any blood inside the condominium.

¶ 18    Deputy Frank Pavlik of the Kendall County Sheriff's Office testified that there was a Chevrolet Trailblazer in the parking lot of the condominium complex that did not have registration plates. Pavlik observed a black purse inside the car, partially opened, with contents including a

wooden-handled serrated blade that looked like a steak knife. Pavlik had the car towed to the Kendall County Sheriff's Office impound lot.

¶ 19    Detective Thomas Haggerty of the Kendall County Sheriff's Office testified that he spoke with Janes, Kelly, and Vizzini at the hospital. Janes was being treated for multiple lacerations sustained during the incident with defendant. Haggerty stated that he also observed "several old scars" located on different areas of Janes's upper torso.

¶ 20    Haggerty further testified that, after advising defendant of her *Miranda* rights, he interviewed her at the sheriff's office at approximately 1 p.m. on November 27, 2017. A video recording of Hagerty's interview was played for the jury. During the interview, defendant told Hagerty that she took an Uber from North Aurora to Kelly's condominium. She wore a Wonder Woman costume. Defendant stated that she went to Kelly's residence to retrieve the keys to her car. Because defendant did not know which unit belonged to Kelly, she yelled for Janes to bring her the car keys. Kelly opened a window, at which point defendant told Kelly, "bitch, this doesn't have anything to do with you." Defendant stated that Janes then exited the unit and told her the keys were at his sister's house. Although defendant admitted pushing Janes first and swinging a metal pole at both Janes and Kelly, she did not remember cutting Janes. Instead, defendant claimed that Janes pushed her back, headbutted her, and pinned her to the sidewalk. Defendant denied knowing how Janes got cut. According to defendant, she did not know where the box cutter came from. After Hagerty told defendant there was no Uber driver, defendant insisted that someone dropped her off at Kelly's residence before admitting she drove her truck there. Defendant denied entering Kelly's residence and claimed that she had blacked out. Defendant admitted she was not invited into Kelly's residence. When confronted with her threat to slit Kelly's throat, defendant downplayed the message and equated it to something she stated she would do to her own throat.

In discussing her threats to the victims, defendant asked Hagerty, "[s]eriously, like why would I try to murder the person that I love?" Defendant also questioned why nobody ran out and called 911. Hagerty responded that they did.

¶ 21    Haggerty further testified that after the Chevrolet Trailblazer was impounded, he photographed the vehicle's interior, including the contents of the purse. Along with the wooden-handled steak knife, the purse contained a pink iPhone, a box cutter, and a wallet with defendant's driver's license. Hagerty also noted that there was a metal pole and gold gloves with a red star on the floor of the front passenger side of the vehicle. Haggerty indicated that he was surprised to find defendant's purse in the vehicle because defendant told him during the interview that she had brought the purse to the scene on Light Road and had placed it in a bush.

¶ 22    After the State rested, defendant moved for a directed verdict. The trial court denied defendant's motion. The defense called Deputy Tyler Riffell of the Kendall County Sheriff's Department. Riffell testified regarding the layout of Kelly's condominium. He also testified that he did not recall seeing any blood stains inside the condominium. Defendant elected not to testify. After defendant rested, the parties presented closing arguments.

¶ 23    Following deliberations, the jury found defendant guilty of two counts of home invasion (counts III and IV), one count of aggravated domestic battery (count V), and one count of armed violence (entered with intent to commit aggravated battery against Janes) (count IX). The jury found defendant not guilty of both attempted murder counts (counts X and XI) and one count of armed violence (entered with intent to commit aggravated battery against Kelly) (count VIII). The trial court ordered a pre-sentence investigation (PSI) report. Thereafter, defendant filed a motion for judgment notwithstanding the verdict or for a new trial. The court denied this motion.

¶ 24   At the beginning of the sentencing hearing, the trial court stated that it had received and reviewed the PSI report. According to the PSI report, defendant has five children and is a college graduate, having obtained a bachelor's degree in English in 2001. Further, defendant reported that she attended counseling at age 13 and was diagnosed as a "schizophrenic," a diagnosis with which she disagreed. Defendant also reported that in 2014, she was diagnosed by a Dr. Gaonkar with bipolar disorder, post-traumatic stress disorder (PTSD), and borderline personality disorder. Defendant further related that she was hospitalized "on occasion" at Mercy Center and that some of the hospitalizations were "involuntary." The PSI investigator requested medical reports from Mercy Center, but none were attached to the PSI report. The PSI report also reflected that defendant was previously convicted of misdemeanor criminal defacement of property, unlawful possession of a controlled substance, and driving under the influence of alcohol. A risk assessment completed in December 2020 rated defendant at a low-to-moderate risk for recidivism. Neither the State nor defendant had any additions or corrections to the PSI report.

¶ 25   The State then presented the testimony of several law-enforcement officers. Officer Eric Rappa of the Aurora Police Department testified that on October 22, 2017, he interviewed a woman named Tkeyah Fitzsimmons. Fitzsimmons told Rappa that she had received text messages from defendant in which defendant admitted that she busted a beer bottle over Janes's head and "shanked" him with it. Defendant further wrote in the text messages to Fitzsimmons that Janes was "disrespectful" and treats her "like a piece of dirt[,] *** [l]ower than dirt even." Defendant also sent text messages claiming that Janes put her in a headlock, beat her until she was almost unconscious, and wiped his blood on her. During his investigation, Rappa learned that there was also an allegation that defendant had stabbed Janes a week earlier. As a result of the stabbing incident, defendant was taken into custody for domestic battery. Rappa testified that there also was

an incident with defendant on October 22, 2017, involving drugs. On cross-examination, Rappa testified that while "on the scene," defendant told him that she is bipolar and that she is fearful of Janes. Rappa denied any knowledge that defendant suffered from PTSD or was schizophrenic.

¶ 26    Detective Kailee Young of the Aurora Police Department testified that she interviewed Brian Yelm, defendant's son, as part of the investigation into an incident on October 22, 2017. Brian told the police that he was in his bedroom at home on October 22, 2017, when he heard defendant and Janes screaming and yelling. Brian went to defendant's bedroom, where he observed blood on Janes's arm and defendant with a beer bottle in her hand. According to Brian, defendant was trying to hit Janes with the bottle and was throwing other household items at Janes. Janes tried to remove the bottle from defendant's hand. Brian stepped in and took the bottle away from defendant. Brian also told Janes that, for his safety, he should leave, which Janes did.

¶ 27    Detective Jennifer Hillgoth of the Aurora Police Department testified that she interviewed defendant's 11-year-old daughter, A.Y., on October 25, 2017, as part of a domestic battery investigation involving defendant and Janes. A.Y. related that she knew that Janes had stitches on both his arm and stomach from two different incidents. A.Y. witnessed the incidents after she woke up to a lot of screaming and yelling from defendant. A.Y. saw defendant chasing Janes around the house with a hammer and a beer bottle. There was blood dripping from Janes's arms. A.Y. described Janes as calm and nice. A.Y. also stated that defendant and Janes fought a lot and that defendant usually hit Janes.

¶ 28    Following Hillgoth's testimony, the State submitted certified copies of defendant's 2018 conviction of unlawful possession of a controlled substance. Defendant was sentenced to 180 days in jail for the conviction, which stemmed from the incident on October 22, 2017. On October 31, 2017, while in jail on the unlawful possession charge, defendant urinated on the floor of her cell

and wrote "f\*\*k the police" in her own feces on the wall. As a result of this conduct, defendant was convicted of misdemeanor defacement of property and sentenced to 10 days in jail. The trial court also took judicial notice of a July 10, 2018, order that placed defendant on GPS monitoring.

¶ 29    Detective Hagerty then testified that pretrial services reported a master tamper alert with defendant's GPS device at approximately 3:34 p.m. on April 10, 2019. With respect to the tamper alert, Hagerty testified that in an April 25, 2019, interview, defendant stated that she unknowingly crossed state lines in violation of her bond conditions. Defendant stated that she was involved with her boyfriend, Ramon Gonzalez, and an acquaintance named "Cholo" in pawning some landscaping equipment. When defendant went to the pawn shop a second time to sell additional equipment, the clerk at the store told defendant that she could no longer do business with her because defendant had previously brought in stolen items. Defendant denied knowing the equipment was stolen. After leaving the pawn shop, the group went to a restaurant. According to defendant, when the group was at the restaurant, the police approached with guns drawn. "Cholo" then became scared, so he drove off and cut off defendant's GPS monitor.

¶ 30    The combined testimonies of Detective Jason Shettles of the Aurora Police Department, Detective Jeffrey Schroder of the Rockford Police Department, and Detective Christopher Richardt of the Mt. Pleasant, Wisconsin Police Department described defendant's involvement with Gonzalez, Angel Castro, and Elijah Campbell in a ring of thefts involving a variety of items, including landscaping equipment, construction tools, and motor vehicles.

¶ 31    In addition, Kelly provided a victim impact statement which was read into the record. In the statement, Kelly described the physical scars defendant left on Janes's chest and arms and Janes's unpaid medical bills. Kelly also wrote that since the incident, Janes has been experiencing symptoms of PTSD, such as insomnia and anxiety. Kelly further indicated that she attended

counseling for her own anxiety and depression, but her insurance ended and she is no longer able to afford it.

¶ 32   Defendant presented testimony from her two adult sons, Donald and Brian Yelm. Donald, who was 23 years of age at the time of sentencing, testified that defendant was married to his father for 15 years. Donald described the relationship between his parents as "great" when he was younger. However, around the time Donald became a junior in high school, they started fighting a lot. According to Donald, his parents eventually began drinking and doing drugs on a daily basis to tolerate each other. Donald testified that he became the "third parent" in the household and took care of his siblings the majority of his senior year in high school. Donald further testified that his father had been abusive to defendant. Donald had seen photographs of his mother beaten black and blue by his father to the point where he could not recognize her. After his parents' divorce, Donald lived primarily with defendant when he was home from college. Donald testified that Janes also resided in the household when he and defendant were dating. Donald believed that defendant was doing drugs during her relationship with Janes. Donald testified that although Janes would frequently yell at defendant, he never witnessed a physical altercation between Janes and defendant. However, Donald did observe injuries on defendant during her relationship with Janes, including cigarette burns and cuts on her arms and wrists.

¶ 33   Defendant's younger son, Brian, was 20 years of age at the time of sentencing. Brian testified that his father had been violent to defendant. Brian recalled an occasion when his father destroyed the entire house, including Brian's room, in the act of beating defendant. Defendant ran to the neighbor's house to get away and call the police. Defendant attempted suicide at one point. Brian lived with defendant after his parents' divorce because of his father's abuse. At some point, Janes moved in with the family. With regard to Janes's relationship with defendant, Brian testified

that Janes and defendant got into frequent arguments. It was a sensitive issue to Brian because of how his father had treated defendant. Brian witnessed Janes spit on defendant multiple times. Brian himself had gotten into arguments with Janes, where Brian told Janes that this was not how Janes should treat his mother. Janes had purchased a gun, and, while playing with it in the house, he shot off a round that went through defendant's bathroom wall. Brian also recounted an incident in which Janes put defendant in a headlock after he became angry when she told him to get out of the house. Defendant grabbed Janes's testicles in an attempt to release herself from the headlock. Brian testified that he frequently told Janes that he did not like the way Janes treated defendant.

¶ 34    Defendant also submitted a letter from a friend, Jennifer Collins. Collins described defendant as a woman of "faith, love, and compassion" and an abuse survivor. Collins stated that defendant is needed by her children. Collins indicated there were years that she and defendant did not see each other or speak, but Collins believed defendant should receive a second chance.

¶ 35    Defendant made a statement in allocution. Defendant related that before her relationship with Janes, her now ex-husband had abused her. During that time, she was diagnosed with bipolar disorder, and she began drinking and using drugs to cope with her mental illness and the physical abuse. Defendant reported that her ex-husband had beaten her "to within an inch of [her] life." He had stomped on her and broken her back. He broke a bar stool over her. Defendant did not sever her relationship with him until her ex-husband was arrested for aggravated domestic battery. Photographs of defendant from the incident leading to her ex-husband's arrest on this charge were entered into evidence.

¶ 36    After her divorce, defendant began a relationship with Janes. When the relationship ended, defendant wanted Janes to return a car for which she had taken out a loan because she wanted to sever the financial ties between her and Janes so they could go their separate ways. That was the

sole reason, she said, that she had gone to the condominium complex on November 27. Defendant stated that Janes came outside and threatened to beat her and then headbutted her. According to defendant, "[w]e literally fought over a car." Defendant stated that she could not find the words to express how sorry she was for her actions and misplaced priorities as well as the senselessness of it all.

¶ 37   Defendant reported that, before the incident, she had been suffering from a severe manic episode. Although she was taking medication, she was not receiving proper medical treatment. Defendant stated that she was in a cycle of domestic abuse, bipolar psychosis, reactions to PTSD, and drug and alcohol abuse. Defendant did not know how she went through one relationship to the next.

¶ 38   Defendant believed that she had lovingly and successfully mothered her five children and had lived the majority of her life with integrity. During the beginning of her relationship with Janes, he seemed to care about her well-being and that of her children. After time, however, he began calling her a "ho" and telling her to kill herself. If she did not answer her phone when he called or texted, he would tell her that she would "pay." Janes punched walls, broke mirrors, and smashed a computer. He broke furniture and drawers. On one occasion, defendant's bedroom was littered with glass. Janes demanded defendant's passwords to her phone, social media accounts, and bank accounts. He made her stay awake some nights, he spit on her, and he tore her clothes and undergarments. Janes slept with guns and told defendant that she was lucky he did not shoot her. Defendant begged Janes to keep quiet so that he would not wake up and frighten the children. Janes forced defendant to have sex on multiple occasions. On one occasion, he put his hands around her neck, spit on her, and called her a "whore." Defendant thought she was going to die. Defendant tried to call the police, but Janes broke her phone. Janes broke four of her phones

between 2016 and 2017. Janes isolated defendant from her family and friends and erased contacts from her phone, including her friends and her Alcoholics Anonymous contacts. After they had broken up, Janes let himself and two other men into her house at 3:30 a.m. using the keypad to her garage.

¶ 39 Defendant became increasingly manic and began drinking more and more. The drinking led to drug use and "more madness and insanity." Defendant was not getting help or counseling. Defendant told the court that she needs therapy, support, and help getting past these situations and that she was begging for help and mercy. Defendant's two youngest boys, ages five and seven, needed her to be a mother to them as they grow up. Defendant said that she regrets what she has done and wants to rebuild and make up for it.

¶ 40 The State argued that consecutive sentences were mandatory because defendant inflicted "severe bodily harm" to Janes. The State asserted that Janes received multiple slash wounds to his chest and arms, some of which were "so deep you could see the tissue in the lower levels of his body." The State further asserted that Janes was given "over 50 sutures" to close the multiple, gaping wounds on his body. The State also noted that because defendant was convicted of aggravated domestic battery, the truth-in-sentencing law required her to serve 85 percent of her sentence for that conviction. The State asked the court to order defendant's sentences for home invasion and armed violence to also be served at 85 percent on the basis that defendant's conduct resulted in "great bodily harm to a victim."

¶ 41 Regarding the length of defendant's sentences, the State argued that there were four compelling factors in aggravation. First, the State asserted that defendant's conduct caused or threatened serious harm to both Janes and Kelly. Second, the State cited defendant's history of prior criminal activity. The State observed that the PSI report and exhibits offered during the course

of the sentencing hearing reflected that defendant had convictions of driving under the influence of alcohol, criminal defacement of property, and unlawful possession of a controlled substance. The State also referenced the allegations of past violence to Janes. Third, the State argued that a significant sentence was needed to deter others. Fourth, the State argued that the evidence established that defendant was convicted of a felony committed while she was released on bail or her own recognizance pending trial for a prior felony and was convicted of such prior felony. Additionally, the State argued that certain non-statutory factors necessitated a lengthy sentence. In this regard, the State argued that defendant had repeatedly lied to the arresting officers regarding the incident at hand. For instance, defendant initially told them that she had taken an Uber to Kelly's condominium and hidden her purse in a bush, when she actually drove there, and her purse was in the car. The State argued that no factors in mitigation applied. Although defendant claimed that she suffered from mental illnesses, there was no evidence that the alleged conditions substantially affected her ability to understand the nature of her acts. Noting that the two convictions of home invasion merged, the State recommended a sentence of 25 years' imprisonment for home invasion, 20 years' imprisonment for armed violence, and 5 years' imprisonment for aggravated domestic battery. The State requested that all sentences be served consecutively and at 85 percent.

¶ 42    Defense counsel asked the court to take notice of defendant's "minimal" criminal history. Defense counsel noted that defendant had the conviction for drug possession, for which she served time in county jail. She successfully completed supervision and counseling for a misdemeanor DUI as well as her 10-day sentence for defacement of property, which was also a misdemeanor. He further noted that defendant was a college graduate, had been married, and had five children with whom she has a great relationship. Defense counsel asserted that defendant was not raised in

"an average household" and was rejected by her parents. Further, she suffered from substance abuse and various mental illnesses, including schizophrenia, bipolar disorder, PTSD, and borderline personality disorder. Defense counsel asserted that, according to the PSI report, defendant was at a low-to-moderate risk for recidivism. In arguing against a finding of "severe great bodily harm," defense counsel asserted that defendant used a box cutter, not a knife, a machete, or a gun. Defense counsel argued that while Janes sustained "some cuts," he did not lose a limb and he waited to go to the hospital. Defense counsel asked the court to find in mitigation that defendant (1) neither caused nor threatened serious physical harm to another, (2) did not contemplate her conduct would cause or threaten serious physical harm to another because she went to get her car, (3) had a minimal criminal history, (4) suffered from serious mental illness, and (5) was the victim of domestic violence at the hands of her ex-husband and Janes. Defense counsel argued for the minimum permissible sentence and asserted that consecutive sentences were not mandatory.

¶ 43    In pronouncing sentence, the court stated that it had considered the PSI report and the financial impact of incarceration. The court also considered the evidence and information offered by the State and the defense in aggravation and mitigation, the sentencing alternatives, defendant's statement in allocution, and the victim impact statement. The court stated that it would not consider the evidence presented by the State regarding the vehicle and equipment thefts in which defendant was alleged to have participated while she was out on bond as she is presumed innocent of those charges. In aggravation, the court found the factors listed by the State applied, including that defendant's conduct caused or threatened harm, that she had a history of prior criminal activity, that the sentence imposed was necessary to deter others from committing the same crime, and that defendant committed the instant offense while out on bail pending trial for a prior felony (unlawful

possession of a controlled substance) for which she was subsequently convicted. With respect to the factors in mitigation, the court stated, "I don't believe that any of those factors apply in this situation." The court found that defendant inflicted "severe bodily injury" and that her conduct resulted in "great bodily harm to a victim." The court noted that although the jury found defendant guilty of two counts of home invasion (counts III and IV), she can only be sentenced on one count. Accordingly, the court merged count IV into count III for purposes of sentencing. The court sentenced defendant to 20 years' imprisonment for home invasion, 18 years' imprisonment for armed violence, and 5 years' imprisonment for aggravated domestic battery. Based on its findings, the court ordered all three sentences to be served consecutively, for an aggregate sentence of 43 years' imprisonment. Additionally, the court found that truth-in-sentencing applied so that defendant would serve 85% of her sentence.

¶ 44    Defendant filed a "Motion to Reduce Sentence." In the motion, defendant raised three principal issues: (1) the trial court improperly applied the "One Act, One Crime sentencing format" to the home-invasion and armed-violence charges; (2) the trial court "improperly sentenced [her] on the basis of a double sentence"; and (3) the trial court improperly "impos[ed] consecutive sentences to the counts and charges of Armed Violence, Home Invasion and Aggravated Battery." In addition, defendant requested resentencing "under the post July 1 2019 assessments." At the hearing on the motion, defense counsel raised the issues set forth in the post-sentencing motion, concluding his argument by stating, "[w]e're asking that the 43-year sentence was excessive, given the circumstances." The trial court denied the post-sentencing motion. This appeal followed.

¶ 45                                   II. ANALYSIS

¶ 46    On appeal, defendant raises four principal issues. Defendant argues that the trial court erred in imposing consecutive sentences on the basis that she inflicted severe bodily injury to Janes.

Defendant also contends that the trial court erred in ordering her to serve 85% of her sentence under the truth-in-sentencing law because Janes's injuries did not merit a finding of great bodily harm to a victim. Further, defendant maintains that the trial court deprived her of a fair sentencing hearing because it refused to give weight to the mitigating factors of her mental illness or the domestic abuse she had endured. In addition, defendant asserts that her 43-year aggregate sentence is excessive when the minimum aggregate sentence of 19 years' imprisonment would provide adequate retribution and provide her with release at an age where she would be restored to useful citizenship and still be unlikely to reoffend. We address each argument below.

¶ 47                               A. Consecutive Sentences

¶ 48     Defendant first argues that the trial court erred in imposing consecutive sentences. Defendant acknowledges that the Unified Code of Corrections (Code) (730 ILCS 5/1-1-1 *et seq*. (West 2016)) mandates consecutive sentences if one of the offenses for which a defendant was convicted was a Class X or Class 1 felony and the offender inflicted "severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2016). According to defendant, however, the trial court erred in finding that she inflicted severe bodily injury, thereby triggering consecutive sentences, because, although Janes's injuries required stitches, his wounds were "superficial" and did not result in significant bleeding. Therefore, defendant requests that we vacate that portion of the sentencing order requiring her sentences to run consecutively and order the trial court to amend the sentencing order so that her sentences run concurrently.

¶ 49     The State responds that the trial court's finding that defendant inflicted severe bodily injury to Janes was not against the manifest weight of the evidence. The State points out that defendant attacked Janes using a box cutter with a three-inch blade, the attack caused lacerations to multiple

areas of Janes's body, Janes required a large number of stitches, and the attack left Janes with scars.

¶ 50     As a general rule, when a court imposes sentences for multiple offenses at the same time, the sentences must run concurrently. 730 ILCS 5/5-8-4(a) (West 2016); *People v. Alvarez*, 2016 IL App (2d) 140364, ¶ 18. An exception to the general rule can be found in section 5-8-4(d)(1) of the Code (730 ILCS 5/5-8-4(d)(1) (West 2016)). Under that exception, consecutive sentences are mandatory when "[o]ne of the offenses for which the defendant was convicted was *** a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2016); see *People v. Stanford*, 2011 IL App (2d) 090420, ¶ 47. Although sentencing issues are generally reviewed for an abuse of discretion (*People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000); *People v. Tolliver*, 2021 IL App (1st) 190129, ¶ 41), whether a defendant inflicted "severe bodily injury" under section 5-8-4(d)(1) of the Code is a question of fact (*People v. Deleon*, 227 Ill. 2d 322, 332 (2008); *Alvarez*, 2016 IL App (2d) 140364, ¶ 19). As such a trial court's determination that an injury is severe for purposes of consecutive sentencing will be reversed on appeal only if it is against the manifest weight of the evidence. *Deleon*, 227 Ill. 2d at 332; *Alvarez*, 2016 IL App (2d) 140364, ¶ 19. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if the finding is unreasonable, arbitrary or not based on the evidence presented. *Deleon*, 227 Ill. 2d at 332; *Alvarez*, 2016 IL App (2d) 140364, ¶ 19. Additionally, we observe that the State's burden of proof at sentencing is lower than that during the guilt phase of the trial. *People v. Terrell*, 185 Ill. 2d 467, 506 (1998); *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14.

¶ 51     Initially, we note that defendant was convicted of various offenses, including home invasion (720 ILCS 5/19-6(a)(2) (West 2016)) and armed violence with a Category II weapon (720

ILCS 5/33A-2(a), 33A-3(a-5) (West 2016)). Both of these offenses are Class X felonies. 720 ILCS 5/19-6(c), 33A-3(a-5) (West 2016). Thus, consecutive sentences were mandatory if the trial court determined that defendant inflicted "severe bodily injury." *Stanford*, 2011 IL App (2d) 090420, ¶ 47 ("When a defendant's convictions bring him within the purview of section 5-8-4, the mandatory sentencing requirement is triggered and consecutive sentences must be imposed."). The trial court made such a finding in this case. For various reasons, defendant argues that the finding was improper. As explained more thoroughly below, we conclude that the trial court's finding that defendant inflicted "severe bodily injury" to Janes was not against the manifest weight of evidence.

¶ 52    There is no clear definition of the phrase "severe bodily injury." In *People v. Mays*, 91 Ill. 2d 251, 256 (1982), the supreme court defined "bodily harm" in the context of a simple battery as "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." Section 5-8-4(d)(1) of the Code, however, requires the defendant to inflict "severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2016). Thus, the statute requires " ' "an injury of a graver and more serious character" ' than simple bodily harm." *People v. Gonzalez*, 351 Ill. App. 3d 192, 207 (2004) (quoting *People v. Ruiz*, 312 Ill. App. 3d 49, 62 (2000) (quoting *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991))). Moreover, this court has also determined that a finding of "severe bodily injury" requires a degree of harm to the victim that is something more than that required to sustain a finding of "great bodily harm." *Alvarez*, 2016 IL App (2d) 140364, ¶ 23-24; but see *People v. Witherspoon*, 379 Ill. App. 3d 298, 308 (2008) (stating that "[t]he difference between 'great bodily harm' and 'severe bodily injury' is merely semantic; no meaningful distinction can be made between 'great' and 'severe' or between 'harm' and 'injury.' ").

¶ 53    Applying the foregoing principles, we conclude that the evidence presented at trial is more than sufficient to support the trial court's finding that Janes sustained "severe bodily injury." Defendant attacked Janes using a box cutter. Deputy Denyko testified that the box cutter had a three-inch blade. Janes described the slashes as "forceful." As a result of the attack, Janes sustained lacerations to his right shoulder, left chest area, right arm, left arm, and left armpit. Kelly described Janes's injuries as "open wounds," noting that Janes had "slices" on his arms and "all the way down his chest." Deputy Cady observed "a lot of blood" on Janes's torso and arms. Photographs of Janes taken by the sheriff's department shortly after the attack show blood dripping from the left side of his chest and down his left arm. In addition, Janes's right shoulder area is dressed in gauze. Janes declined medical care at the scene, explaining that he "really didn't think [he] needed stitches at the time." Less than an hour later, however, Kelly drove Janes to the hospital emergency room. Kelly testified that on route to the hospital, Janes was "bleeding all over" and "screaming a lot that he was in pain." In the emergency room, Janes received stitches to multiple areas of his body. Although the exact number of stitches is not clear from the record, photographs of Janes taken at the hospital depict him with a line of stitches down his left chest area from armpit level to just above the bottom of the rib cage. Janes also had stitches to his right shoulder area, his upper left arm, and his left forearm. In her victim impact statement, prepared almost three years after the attack, Kelly described the physical scars defendant's attack left on Janes's arms and chest. Given this cumulative evidence, we cannot say that the trial court's finding that defendant inflicted "severe bodily injury" to Janes was unreasonable, arbitrary, or not based on the evidence or that a conclusion opposite to that of the trial court is clearly apparent. Thus, the trial court's finding of "severe bodily injury" is not against the manifest weight of the evidence.

¶ 54   Despite the foregoing, defendant argues that a finding of "severe bodily injury" was unwarranted because Janes's wounds were merely "superficial." We disagree. As Illinois courts have recognized, "[s]uperficial wounds do not require stitches." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 70; *People v. Cisneros*, 2013 IL App (3d) 110851, ¶ 14. Indeed, it is worth noting that Illinois courts have upheld a trial court's finding of "severe bodily injury" where the victim sustained lacerations requiring stitches or staples to repair. See, *e.g.*, *People v. Montgomery*, 373 Ill. App. 3d 1104, 1121-22 (2007) (determining that trial court's finding of "severe bodily injury" was not against the manifest weight of the evidence where the defendant pistol-whipped and kicked the victim, causing bruises, hematomas, and cuts which required seven staples to the victim's head and stitches to his lip), *abrogated on other grounds by People v. Ayres*, 2017 IL 120071; *People v. Israel*, 181 Ill. App. 3d 851, 857, 860-61 (1989) (holding that five-centimeter vaginal laceration "repaired" by doctor constituted "severe bodily injury"); *People v. Knight*, 139 Ill. App. 3d 188, 196-97 (1985) (affirming trial court's finding of "severe bodily injury" where the victim suffered scars to her breasts and a laceration to her vagina which required stitches). Defendant also suggests that the failure to identify the exact number of stitches Janes received from this attack created a deficiency in the evidence. We disagree. As noted above, photographs of Janes in the hospital show Janes with a line of stitches down his left chest area from armpit level to just above the bottom of the rib cage. The photographs also show Janes with stitches to his right shoulder area, his upper left arm, and his left forearm. Based on the observable multiple lacerations requiring stitches to Janes's torso and upper extremities, the failure to identify the exact number of stitches Janes received does not mandate reversal of the trial court's finding of severe bodily injury.

¶ 55 Defendant also contends that Janes's injuries were not severe because Kelly initially testified that Janes was not "bleeding bad[ly]" and no blood was found inside Kelly's condominium. Although Kelly's testimony indicated that Janes *initially* suffered little loss of blood, Kelly testified that during the subsequent ride to the hospital, Janes was "bleeding all over." Further, Deputy Cady observed "a lot of blood" on Janes's torso and arms and photographs of Janes taken by the sheriff's department shortly after the attack show blood dripping from the left side of his chest and down his left arm. In any event, whether a victim suffers blood loss is not determinative; rather, it is but one factor to consider in assessing whether a victim suffered "severe bodily injury." *People v. Laboy*, 227 Ill. App. 3d 654, 668 (1992).

¶ 56 Defendant directs us to several cases in which courts have determined that the victim's injuries did not constitute "severe bodily injury," suggesting that the nature of those victims' injuries are similar to those sustained by Janes in this case. See, *e.g.*, *People v. Jones*, 323 Ill. App. 3d 451, 461 (2001) (concluding that the trial court erred in finding that the victim's wound constituted "severe bodily injury" where the victim's cheek was "grazed" by a bullet and the victim did not require any medical treatment other than a bandage); *People v. Murray*, 312 Ill. App. 3d 685, 694 (2000) (holding that gunshot wound to the victim's right foot did not constitute "severe bodily injury" where the victim sustained an open fracture to the big toe and he was treated and released from the hospital within 2½ hours of the shooting); *People v. Durham*, 312 Ill. App. 3d 413, 420-21 (2000) (holding that gunshot wound which was described as "a small nick or cut" and for which the victim refused medical treatment did not constitute "severe bodily injury"); *Ruiz*, 312 Ill. App. 3d at 63 (holding that gunshot wound to the knee did not constitute "severe bodily injury" where the wound was barely visible and the victim went to a meeting before seeking medical treatment). Defendant's reliance on these cases is inapposite for two principal reasons.

First, although the victims in the cases cited by defendant sustained gunshot injuries, the nature of the described wounds was less severe than the wounds sustained by Janes. Second, the comparative approach taken by defendant is problematic because our standard of review is deferential. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14. In this regard, we observe that sometimes a finding that a victim's injuries constitute "severe bodily injury" may be "rationally defensible" even though the opposite conclusion would likewise be "rationally defensible." See *Witherspoon*, 379 Ill. App. 3d at 310. As stated previously, however, we may not reverse a trial court's determination that a victim suffered "severe bodily injury" unless that finding is against the manifest weight of the evidence. *Deleon*, 227 Ill. 2d at 332; *Alvarez*, 2016 IL App (2d) 140364, ¶ 19. We simply cannot conclude that the cases cited by defendant compel the conclusion that the trial court's finding of "severe bodily injury" in this case met that standard.

¶ 57    Defendant also claims that because "severe bodily injury" requires something more than "great bodily harm," cases dealing with the factual sufficiency for a finding of "great bodily harm" are instructive. In support of her position, defendant directs us to *In re T.G.*, 285 Ill. App. 3d 838 (1996), and *In re J.A.*, 336 Ill. App. 3d 814 (2003).

¶ 58    In *T.G.*, the respondent was adjudicated delinquent of various offenses, including aggravated battery causing "great bodily harm." At trial, the evidence showed that the victim sustained three stab wounds to the chest. The victim felt the first stab, which he described as "like being poked with a pen or pencil." There was no evidence that the victim felt the other two stabs. The victim further testified that he did not realize that he had been stabbed until after he noticed his shirt was cut. When he opened his shirt, he saw three bloody wounds. In concluding that there was insufficient evidence of "great bodily harm," the reviewing court considered the evidence of

the three stab wounds, but noted that "[t]here was no evidence of the extent or nature of [the victim's] injuries." *T.G.*, 285 Ill. App. 3d at 846.

¶ 59    In *J.A.*, the victim sustained a single stab wound to the back of the left shoulder. The victim stated the puncture felt "like somebody pinch [*sic*] you." At the hospital, the victim was advised to have his wound stitched, but he refused and was given pain pills. Based on this evidence, the trial court adjudicated the respondent delinquent of aggravated battery causing great bodily harm. On appeal, the respondent argued that the State failed to prove the element of "great bodily harm" beyond a reasonable doubt and asked that his delinquency finding be reduced to battery. In agreeing with the respondent, the reviewing court explained that there was no evidence of the nature and extent of the victim's injury beyond the fact that he felt like he had been pinched and he was advised to have the wound stitched. *J.A.*, 336 Ill. App. 3d at 818. In this regard, the court noted that there was no evidence the victim was bleeding, there was no description of the size, depth, or length of the victim's wound, and there was no evidence as to the number of stitches recommended or who made the recommendation. *J.A.*, 336 Ill. App. 3d at 818. The court also observed that the trier of fact was not given the opportunity to view the victim's wound photographically or in open court. *J.A.*, 336 Ill. App. 3d at 818. The court concluded that "[p]roof of great bodily harm to sustain a conviction for aggravated battery requires more than evidence of a single stab wound of indeterminate size, which felt like a pinch and for which an indeterminate number of stitches were advised by someone unnamed." *J.A.*, 336 Ill. App. 3d at 818-19. As such, the court modified the adjudication of delinquency from aggravated battery causing great bodily harm to simple battery. *J.A.*, 336 Ill. App. 3d at 820.

¶ 60    Defendant's reliance on *T.G.* and *J.A.* misplaced. Unlike in those cases, the State presented ample evidence of the nature and extent of Janes's injuries. This evidence consisted of both witness

testimony and photographs of Janes's wounds—both before and after he received treatment. Furthermore, as noted above, given the deferential standard of review applicable to this issue, we cannot say that the trial court's finding of "severe bodily injury" was against the manifest weight of the evidence.

¶ 61   In short, based on the record set forth above, the trial court's finding that defendant inflicted "severe bodily injury" to Janes was not against the manifest weight of the evidence. As such, the trial court did not err in ordering defendant's sentences to run consecutively.

¶ 62                              B. Truth-In-Sentencing

¶ 63   Next, defendant challenges the trial court's finding that her conduct resulted in "great bodily harm to a victim," thereby triggering the requirement that she serve 85% of her sentences for home invasion and armed violence with a Category II weapon pursuant to the truth-in-sentencing law. See 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016).[1] According to defendant, the trial court's finding of "great bodily harm" was erroneous because Janes's injuries were "superficial," Janes was not "bleeding bad[ly]" after the incident, and Janes refused medical treatment at the scene. Defendant requests that we vacate the portion of the sentencing order requiring her sentences to be served at 85% and order the trial court to amend the sentencing order to reflect day-for-day credit.

¶ 64   The State initially responds that defendant forfeited this issue by failing to raise it in her post-sentencing motion. The State further responds that if we elect to address the issue, the trial

---

[1] Defendant acknowledges that a separate provision of the Code requires her to serve 85% of her conviction of aggravated domestic battery. See 730 ILCS 5/3-6-3(a)(2)(vii) (West 2016). Defendant does not contest the applicability of the truth-in-sentencing law to that conviction.

court's finding that defendant's conduct resulted in "great bodily harm to a victim" was not against the manifest weight of the evidence. As it did in relation to the trial court's finding of "severe bodily injury," the State points out that defendant attacked Janes using a box cutter with a three-inch blade, the attack caused lacerations to multiple areas of Janes's body, Janes required a large number of stitches, and Janes was left with scars. The State also observes that Kelly was attacked by defendant, resulting in a welt when defendant struck her with a metal pole and cuts to her finger and rib area.

¶ 65 We agree with the State that defendant has forfeited this claim. To properly preserve a sentencing issue for review, both a contemporaneous objection *and* a written post-sentencing motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010); see also 730 ILCS 5/5-4.5-50(d) (West 2016) (providing that "[a] defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the circuit court clerk within 30 days following the imposition of sentence"). The purpose of a post-sentencing motion is to give the reviewing court the benefit of the trial court's judgment on the specific allegation. *People v. Baez*, 241 Ill. 2d 44, 129-30 (2011). Broad and general allegations in a post-sentencing motion are inadequate to advise the trial court of the challenge being raised and are inadequate to preserve an issue for appellate review. *People v. Johnson*, 250 Ill. App. 3d 887, 893 (1993). In this case, defendant filed a timely post-sentencing motion raising various contentions of error, including that the trial court improperly "impos[ed] consecutive sentences to the counts and charges of Armed Violence, Home Invasion and Aggravated Battery." However, nowhere in the post-sentencing motion (or at the sentencing hearing) did defendant challenge the trial court's finding that her conduct resulted in "great bodily harm to a victim," thereby triggering

the requirement that she serve 85% of her sentences pursuant to the truth-in-sentencing law. Consequently, this issue has been forfeited on appeal.

¶ 66    In her reply brief, defendant argues that we should review the issue as plain error. We observe that plain error, although not raised in a defendant's opening brief, may be properly presented for the first time in a reply brief. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010); *People v. Rodriguez-Palomino*, 2019 IL App (2d) 160361-B, ¶ 27. The plain-error rule is a limited and narrow exception to the forfeiture rule. *Hillier*, 237 Ill. 2d at 545. In the sentencing context, the plain-error doctrine allows a reviewing court to consider an unpreserved error where (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion. *Hillier*, 237 Ill. 2d at 545. If the defendant fails to meet this burden, the procedural default will be honored. *Hillier*, 237 Ill. 2d at 545. The first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Jackson*, 2021 IL App (1st) 180672, ¶ 21.

¶ 67    The "truth-in-sentencing" law refers to a change in the statutory method used by the Illinois Department of Corrections to calculate eligibility for good-conduct credit. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. Ordinarily, a prisoner is entitled to day-for-day good-conduct credit against his or her sentence. 730 ILCS 5/3-6-3(a)(2.1) (West 2016); *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. However, under the truth-in-sentencing law, a prisoner convicted of certain enumerated offenses is entitled to earn a maximum of 4.5 days of good-conduct credit for each month of his or her sentence of imprisonment. 730 ILCS 5/3-6-3(a)(2) (West 2016); *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. Among the offenses subject to the 4.5-day-per-month limitation

are (1) home invasion when the court finds that the conduct leading to the conviction resulted in "great bodily harm to a victim" (730 ILCS 5/3-6-3(a)(2)(iii) (West 2016)) and (2) armed violence with a Category I or Category II weapon when the court finds that the conduct leading to the conviction resulted in "great bodily harm to a victim" (730 ILCS 5/3-6-3(a)(2)(iii) (West 2016)). A prisoner subject to the foregoing provisions of the truth-in-sentencing law does not receive normal day-for-day good-conduct credit and must serve at least 85% of his or her sentence. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11; *People v. Salley*, 373 Ill. App. 3d 106, 109 (2007).

¶ 68    Here, we conclude that defendant failed to meet her burden of showing clear or obvious error occurred. The jury convicted defendant of home invasion and armed violence with a Category II weapon. Thus, defendant was subject to the 4.5-days-per-month limitation of good-conduct credit if the trial court found that the conduct leading to defendant's convictions resulted in "great bodily harm to a victim." 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016). This court has observed that the term " 'great bodily harm is not susceptible of a precise legal definition.' " *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13 (quoting *People v. Mimes*, 2011 IL App (1st) 082747, ¶ 29). As noted earlier, "bodily harm" in the context of an ordinary battery requires "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *Mays*, 91 Ill. 2d at 256. Thus, "great bodily harm" " 'requires an injury of a greater and more serious character than an ordinary battery.' " *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13 (quoting *Mimes*, 2011 IL App (1st) 082747, ¶ 29). Whether a victim's injuries constitute great bodily harm is a question of fact. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14. As such, we may not reverse a trial court's determination that a victim suffered great bodily harm unless that finding is against the manifest weight of the evidence. *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 64. A finding is against the manifest weight of the evidence only if the opposite conclusion is

clearly apparent or if the finding is unreasonable, arbitrary or not based on the evidence presented. *Deleon*, 227 Ill. 2d at 332; *Alvarez*, 2016 IL App (2d) 140364, ¶ 19. As noted earlier, the State's burden of proof at sentencing is lower than that during the guilt phase of the trial. *Terrell*, 185 Ill. 2d at 506; *Lopez Bonilla*, 2011 IL App (2d) 100688, ¶ 14.

¶ 69     In this case, the trial court found that the conduct leading to defendant's convictions resulted in "great bodily harm to a victim." As such, the trial court ordered defendant to serve 85% of her sentence. 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016). In arguing that the evidence supporting a finding of "great bodily harm" was improper, defendant essentially reiterates the arguments she made in support of her claim that the trial court improperly found that she inflicted "severe bodily injury" to Janes. That is, defendant contends that while Janes required stitches, his wounds were merely "superficial." Defendant also maintains that the nature of Janes's injuries did not merit a finding of great bodily harm because Janes was not bleeding badly after the incident and he refused medical treatment at the scene. We previously rejected defendant's claim that the nature of Janes's injuries were insufficient to establish "severe bodily injury." Additionally, we observe that a finding of "severe bodily injury" requires proof of a degree of harm that is something more than the degree of harm needed to sustain a finding of "great bodily harm." See *Alvarez*, 2016 IL App (2d) 140364, ¶¶ 23-24; *People v. Williams*, 335 Ill. App. 3d 596, 600 (2002). Thus, where, as here, the nature and extent of Jane's wounds supported the trial court's finding of "severe bodily injury," it was also sufficient for a finding of "great bodily harm." In other words, for the reasons cited in relation to our conclusion that the trial court's finding of "severe bodily injury" was not against the manifest weight of the evidence, we also find that the trial court's finding of "great bodily harm to a victim" is not against the manifest weight of the evidence. Because defendant has failed to establish that clear or obvious error occurred, relief is not warranted under the plain-error doctrine.

See *People v. Wright*, 2017 IL 119561, ¶ 87 (noting that where no error occurred, there can be no plain error).

¶ 70    Defendant also asserts for the first time in her reply brief that she received ineffective assistance of counsel based on her trial attorney's failure to include this issue in her post-sentencing motion. However, points not argued in the appellant's brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Our supreme court "has repeatedly held an appellant's failure to argue a point in the opening brief results in forfeiture under Supreme Court Rule 341(h)(7)." *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 23. This applies to claims of ineffective assistance of counsel raised for the first time in a reply brief. See *People v. English*, 2011 IL App (3d) 100764, ¶¶ 21-23. As her ineffective assistance of counsel claim was improperly raised for the first time in defendant's reply brief, she has forfeited consideration of it.

¶ 71    Forfeiture notwithstanding, defendant's claim of ineffective assistance of counsel lacks merit. For a claim of ineffective assistance of counsel to succeed, a defendant must satisfy the two-pronged test in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). A defendant must first establish that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *Hodges*, 234 Ill. 2d at 17; *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, a defendant must establish that counsel's deficient performance prejudiced him or her. *Hodges*, 234 Ill. 2d at 17. In most situations, prejudice is established by showing a reasonable probability that the outcome of the proceeding would have been different absent counsel's errors. *People v. Valdez*, 2016 IL 119860, ¶ 14. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v.*

*Peterson*, 2017 IL 120331, ¶ 79. As we have concluded that the trial court's finding that defendant's conduct resulted in "great bodily harm to a victim" was not against the manifest weight of the evidence, a reasonable probability does not exist that the result of the proceeding would have been different if trial counsel had raised the issue in a post-sentencing motion. Thus, regardless of forfeiture, defendant's claim of ineffective assistance of trial counsel fails.

¶ 72                                  C. Mitigating Factors

¶ 73    Next, we turn to defendant's argument that the trial court abused its discretion by failing to consider relevant mitigation evidence in sentencing her. In particular, defendant contends that the trial court erred by failing to consider the statutory mitigating factors that (1) she was suffering from a serious mental illness and (2) she had been the victim of domestic violence. 730 ILCS 5/5-5-3.1(a)(15), (16) (West 2016). Defendant asserts that the trial court's statement that it did not believe that any of the statutory factors in mitigation "apply in this situation" showed that it failed to consider the foregoing mitigating factors. Defendant asserts that the trial court's refusal to consider relevant mitigating factors has resulted in her receiving a *de facto* life sentence that provides her with no opportunity for rehabilitation or meaningful reentry into the community and which is highly disproportionate to the offenses of which she was convicted and greatly at variance with the spirit and purpose of the law. Defendant therefore requests that we reduce her sentences to the statutory minimum or remand the matter for a new sentencing hearing in front of a different judge. Defendant acknowledges that defense counsel did not specifically raise this argument in a written post-sentencing motion. In the event this court finds the issue forfeited, defendant requests that we review this issue for plain error or ineffective assistance of counsel.

¶ 74    The State initially responds that defendant forfeited review of this issue because she did not raise it in her post-sentencing motion. Forfeiture aside, the State contends that defendant's

argument is not amenable to plain-error analysis and it does not establish ineffective assistance of trial counsel. In this regard, the State posits that there was no objective evidence that defendant was suffering from a mental illness at the time of the offense or that her status as a victim of domestic violence excused her criminal conduct. Thus, the State posits, the trial court did not have to accept the "unsubstantiated and contradictory evidence" proffered by defendant. As such, the State reasons that defendant cannot establish that the trial court's alleged failure to consider this evidence amounted to plain error or that trial counsel was ineffective for failing to raise this issue in a post-sentencing motion. Therefore, defendant's claim that the trial court abused its discretion by failing to consider relevant mitigation evidence in sentencing her must be rejected.

¶ 75    At the outset, we agree with the State that defendant has forfeited review of this issue because she did not raise it in her post-sentencing motion. As noted earlier, to properly preserve a sentencing issue for review, both a contemporaneous objection *and* a written post-sentencing motion raising the issue are required. *Hillier*, 237 Ill. 2d at 544; see also 730 ILCS 5/5-4.5-50(d) (West 2016). In this case, defendant filed a timely post-sentencing motion raising various contentions of error. However, she did not argue that the trial court abused its discretion by failing to consider relevant mitigation evidence in sentencing her. Consequently, this issue has been forfeited on appeal. *People v. Sebby*, 2017 IL 119445, ¶ 48 (noting that the failure to make a contemporaneous objection and raise the issue in a written post-sentencing motion constitutes forfeiture); *People v. Reed*, 177 Ill. 2d 389, 393-94 (1997) (holding that the 1993 amendment to section 5-8-1(c) of the Code requires that a defendant file a written post-sentencing motion in the trial court to preserve sentencing issues for appellate review). Because defendant failed to preserve this issue for review, we turn to her request that we review the issue under the plain-error doctrine.

¶ 76     As noted previously, the plain-error doctrine serves as a narrow and limited exception to the general forfeiture rule. *Hillier*, 237 Ill. 2d at 545. To prevail under the plain-error doctrine, a defendant must first demonstrate clear and obvious error. *Piatkowski*, 225 Ill. 2d at 565; *Jackson*, 2021 IL App (1st) 180672, ¶ 21. If an error occurred, we will reverse only where (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion. *Hillier*, 237 Ill. 2d at 545. If the defendant fails to meet this burden, the procedural default will be honored. *Hillier*, 237 Ill. 2d at 545.

¶ 77     Initially, we observe that a sentence falling within the statutory range is presumed to be proper. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 36. Here, defendant was convicted of home invasion, armed violence with a Category II weapon, and aggravated domestic battery. Home invasion is a Class X felony and carries a sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/19-6(a)(2), (c) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). Armed violence with a Category II weapon is a Class X felony with a sentencing range of 10 to 30 years' imprisonment. 720 ILCS 5/33A-2(a), 33A-3(a-5) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). Aggravated domestic battery is a Class 2 felony with a sentencing range of 3 to 7 years' imprisonment. 720 ILCS 5/12-3.3(a) (West 2016); 730 ILCS 5/5-4.5-35(a) (West 2016). Defendant was sentenced to 20 years' imprisonment for home invasion, 18 years' imprisonment for armed violence with a Category II weapon, and 5 years' imprisonment for aggravated domestic battery. Although defendant complains that her sentence for home invasion is more than "three times" the minimum sentence, her sentence for armed violence is almost "double" the minimum sentence, and her

sentence for aggravated domestic battery is "two years beyond the minimum," we observe that each of these sentences falls within the mid-range of their respective statutory ranges.

¶ 78 A sentence within the statutory range for an offense will not be disturbed on appeal unless the trial court has abused its discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). An abuse of discretion occurs if the trial court imposes a sentence that "is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. It is well established that "[a] trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation." *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2003). Where relevant evidence in mitigation of a defendant's sentence is before the court, it is presumed that the court considered that evidence, absent some evidence in the record to the contrary other than the sentence itself. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 64. We note, however, that "[t]he sentencing court need not accept the defendant's allegations regarding mitigating matters at face value in the presence of evidence to the contrary." *People v. Matzker*, 115 Ill. App. 3d 70, 75 (1983). Moreover, the existence of mitigating factors does not mandate imposition of the minimum sentence (*People v. Garibay*, 366 Ill. App. 3d 1103, 1009 (2006)) or preclude imposition of the maximum sentence (*People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001)). It is the trial court's responsibility "to balance relevant factors and make a reasoned decision as to the appropriate punishment in each case." *People v. Latona*, 184 Ill. 2d 260, 272 (1998).

¶ 79 Here, in pronouncing sentence, the trial court stated that it had considered the evidence received at trial in the matter, the PSI report, the financial impact of incarceration, the evidence in aggravation and mitigation offered by the parties, the arguments as to sentencing alternatives, the victim impact statement, and defendant's statement in allocution. The court then discussed the

evidence in aggravation. Specifically, the court found that (1) defendant's conduct caused or threatened serious harm (730 ILCS 5/5-5-3.2(a)(1) (West 2016)), (2) defendant had a history of prior criminal activity (730 ILCS 5/5-5-3.2(a)(3) (West 2016)), (3) the sentence was necessary to deter others from committing the same crime (730 ILCS 5/5-5-3.2(a)(7) (West 2016)), and (4) the defendant was convicted of a felony committed while she was on pretrial release on her own recognizance pending trial for a prior felony and was convicted of such prior felony (730 ILCS 5/5-5-3.2(a)(12) (West 2016)).With respect to factors in mitigation, the court said, "I don't believe that any of those factors apply in this situation." The court then briefly addressed other matters before pronouncing sentence.

¶ 80    Defendant argues that the trial court's statement that it found no mitigating factors applied in her case "directly contradicts" the presumption that a sentencing court afforded the appropriate weight to each factor. Defendant further posits that the court's remarks show that it "failed to properly balance such factors in consideration of both the retributive and rehabilitative purpose of punishment." We disagree.

¶ 81    Section 5-5-3.1(a)(16) of the Code provides that the following ground shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment:

> "(16) At the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient to establish the defense of insanity, substantially affected his or her ability to understand the nature of his or her acts or to confirm his or her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(16) (West 2016).

Accordingly, for this factor to apply, there must have been evidence in the record that (1) at the time of the offense, (2) defendant was suffering from a serious mental illness which (3) substantially affected her ability to understand the nature of her acts or to conform her conduct to

the requirements of the law. In other words, it is not simply the fact that a defendant suffers from a mental illness that constitutes a mitigating factor. Rather, the defendant must suffer from the mental illness at the time of the offense, the mental illness must be serious, and the mental illness must have "substantially affected [the defendant's] ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(16) (West 2016); see also *People v. Solis*, 2019 IL App (4th) 170084, ¶ 24 (rejecting the defendant's claim that the trial court failed to consider that his "mental capabilities were a substantial ground tending to excuse or justify his criminal conduct" (730 ILCS 5/5-5-3.1(a)(4) (West 2014)) where the trial court considered the evidence related to the defendant's mental ability, but found that the statutory mitigating factor did not apply because the defendant knew right from wrong).

¶ 82    In light of the foregoing, we conclude that defendant failed to meet her burden to establish that the trial court committed clear or obvious error when it determined that the serious-mental-illness mitigating factor did not apply in her case. The evidence presented at the sentencing hearing regarding whether defendant suffered from a serious mental illness was scant. It consisted almost entirely of statements defendant made to others that she suffered from various mental illnesses without any independent corroboration. For instance, Officer Rappa testified that defendant told him that she was bipolar. Defendant also told the PSI report investigator that she was diagnosed with schizophrenia when she was 13 (a diagnosis with which defendant disagreed) and that in 2014 she was diagnosed with bipolar disorder, PTSD, and borderline personality disorder. In addition, defendant told the PSI report investigator that she was hospitalized on occasion at Mercy Center, with some of the hospitalizations being "involuntary." Although the PSI report investigator requested medical reports from Mercy Center, none were attached to the PSI report. Defendant made similar claims in her statement in allocution. Defendant reported that while she was married,

she was diagnosed with bipolar disorder and abused substances to cope with mental illness and physical abuse. Defendant also stated that she was in a cycle of domestic abuse, bipolar psychosis, reactions to PTSD, and drug and alcohol abuse. Again, however, none of these diagnoses were corroborated. Moreover, the only evidence that defendant had a mental illness at the time of the offense in 2017 was her own statement in allocution that, prior to the incident in question, she had been suffering from a severe manic episode. The trial court witnessed defendant during the proceedings. Therefore, it was in the best position to weigh defendant's credibility, demeanor, and general moral character. *Stacey*, 193 Ill. 2d at 209; see also *People v. Young*, 250 Ill. App. 3d 55, 65 (1993) (rejecting the defendant's claim that the trial court did not properly consider his "mental retardation" as a mitigating factor where the defendant presented no definitive evidence of the condition).

¶ 83 Even if we accept defendant's uncorroborated testimony that she was diagnosed with various mental illnesses, it was also incumbent upon her to show that, at the time of the offenses, these conditions "substantially affect[ed] *** her ability to understand the nature of *** her acts or to conform *** her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(16) (West 2016); see also *Solis*, 2019 IL App (4th) 170084, ¶ 24. Citing the criteria for personality disorders as set forth in the Diagnostic and Statistical Manual of Mental Disorders (see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 *General Personality Disorder* 646 (2013) and DSM-5 *Borderline Personality Disorder* 663-64 (2013)), defendant suggests that her mental illnesses impacted her ability to conform her conduct to the requirements of the law. However, defendant does not point to any evidence presented at the sentencing hearing that the mental illnesses with which she was allegedly diagnosed "substantially affected" her ability to conform her conduct to the requirements of the law or to understand the

nature of her acts. To the contrary, we note that shortly after the incident, during her interview with Detective Haggerty, defendant fabricated details about the incident, such as how she was transported to Kelly's condominium and what she did with her purse. This evidence suggests that defendant was keenly aware of what she was doing and knew that her conduct was unlawful.

¶ 84    Similarly, we note that section 5-5-3.1(a)(15) of the Code provides that the following ground shall be accorded weight in favor of withholding or minimizing a sentence of imprisonment:

"(15) At the time of the offense, the defendant is or had been the victim of domestic violence and the effects of the domestic violence tended to excuse or justify the defendant's criminal conduct. As used in this paragraph (15), 'domestic violence' means abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986 [750 ILCS 60/103 (West 2016)]." 730 ILCS 5/5-5-3.1(a)(15) (West 2016).

Accordingly, for this factor to apply, there must have been evidence in the record that (1) at the time of the offense, (2) defendant is or had been the victim of domestic violence, and (3) the effects of the domestic violence tended to excuse or justify the defendant's criminal conduct. Thus, it is not simply the fact that a defendant has been the victim of domestic violence that constitutes a mitigating factor. Rather, at the time of the offense, "the effects of the domestic violence" must also "tend[] to excuse or justify the defendant's criminal conduct." 730 ILCS 5/5-5-3.1(a)(15) (West 2016); see also *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 208 (noting that a defendant's status as a victim of domestic abuse may be a mitigating factor but only to the extent that the effects of the domestic violence tended to excuse or justify the defendant's criminal conduct).

¶ 85    We conclude that defendant failed to meet her burden to establish that the trial court committed clear or obvious error when it determined that the victim-of-domestic-violence

mitigating factor did not apply in her case. While there was evidence at the sentencing hearing that defendant was the victim of domestic violence at the hands of both her ex-husband and Janes, defendant failed to present evidence that, at the time of the offense, "the effects of the domestic violence tended to excuse or justify [her] criminal conduct." Again, on this point, defendant does not indicate what evidence she presented at the sentencing hearing. To be sure, there was evidence that Janes had abused defendant during their relationship. By Janes's account, however, the relationship had ended months prior to the events of November 2017. Thereafter, Janes started dating Kelly and moved his belongings out of defendant's home. There was no evidence that, following the couple's split, Janes threatened or otherwise abused defendant. To the contrary, the evidence establishes that, on the night of the offenses, defendant went to Kelly's condominium armed with a box cutter and a metal pipe, broke into the condominium, and attacked Janes and Kelly. In other words, it was defendant who, as the aggressor and without any apparent provocation, sought out Janes, demanding possession of a car. Defendant related, "we literally fought over a car" and it was *senseless.*

¶ 86    In short, the record establishes that the court considered the evidence and information presented regarding defendant's mental health and her status as a victim of domestic violence. However, the court determined that these statutory factors did not apply to reduce defendant's sentence because she failed to satisfy the elements of the mitigating factors. See *Matzker*, 115 Ill. App. 3d at 75. The trial court's decision did not constitute an abuse of discretion. Moreover, that the court gave weight to any applicable mitigating evidence and defendant's rehabilitation potential is shown by the fact that the court sentenced defendant to less than the maximum sentences available. See *People v. Sven*, 365 Ill. App. 3d 226, 243-44 (2006) (noting that the defendant was shown some leniency where the sentence he received was closer to the minimum

available sentence). Because defendant has failed to establish that clear or obvious error occurred, relief is not warranted under the plain-error doctrine. See *Wright*, 2017 IL 119561, ¶ 87 (noting that where no error occurred, there can be no plain error).

¶ 87    Alternatively, defendant requests that we review this issue for ineffective assistance of counsel. As noted earlier, for a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test in *Strickland*, 466 U.S. 668. See *Hodges*, 234 Ill. 2d at 17. A defendant must first establish that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *Hodges*, 234 Ill. 2d at 17; *Manning*, 227 Ill. 2d at 416. Second, a defendant must establish that counsel's deficient performance prejudiced him or her. *Hodges*, 234 Ill. 2d at 17. In most situations, this is done by showing a reasonable probability that the outcome of the proceeding would have been different absent counsel's errors. *Valdez*, 2016 IL 119860, ¶ 14. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *Peterson*, 2017 IL 120331, ¶ 79. As we have concluded that the trial court did not abuse its discretion in finding that the statutory factors cited by defendant are inapplicable to her case, a reasonable probability does not exist that the result of the proceeding would have been different if trial counsel had raised the issue in a post-sentencing motion. Thus, defendant's claim of ineffective assistance of trial counsel fails.

¶ 88                                   D. Excessive Sentence

¶ 89    Defendant also argues that the 43-year aggregate sentence imposed by the trial court is excessive. Defendant notes that she was 43 years of age when she was sentenced. Thus, and because she was ordered to serve 85% of her sentence, the earliest age at which she would be released would be 79½ years of age. Defendant asserts that the sentence imposed therefore

amounts to a *de facto* life sentence and fails to provide her with an opportunity for rehabilitation or restoration to useful citizenship. Defendant argues that the minimum aggregate sentence of 19 years' imprisonment would provide adequate retribution and allow her release at an age where she could be restored to useful citizenship and still be unlikely to reoffend. Defendant observes that although defense counsel, at the hearing on her post-sentencing motion, argued generally that the sentence was excessive, he did not specifically raise this argument in her written post-sentencing motion. Defendant therefore requests that we review this issue for plain error or ineffective assistance of counsel in the event this court finds the issue forfeited.

¶ 90     The State initially responds that defendant forfeited this argument for review because she failed to raise it in the trial court. Forfeiture notwithstanding, the State contends that defendant's argument is not amenable to plain-error analysis and it does not establish ineffective assistance of trial counsel. In this regard, the State notes that the sentences imposed by the trial court fall within the permissible sentencing range and defendant was convicted of invading a residence and viciously attacking her ex-boyfriend and his current girlfriend with a metal pipe and a box cutter. As such, the State reasons that defendant cannot establish that the sentences imposed by the trial court amounted to plain error or that trial counsel was ineffective for failing to raise this issue in a post-sentencing motion.

¶ 91     At the outset, we agree with the State that defendant has forfeited review of this issue because she did not raise it in her post-sentencing motion. As noted earlier, to properly preserve a sentencing issue for review, both a contemporaneous objection *and* a written post-sentencing motion raising the issue are required. *Hillier*, 237 Ill. 2d at 544; see also 730 ILCS 5/5-4.5-50(d) (West 2016). In this case, defendant filed a timely post-sentencing motion raising various contentions of error. However, she did not argue in her written motion that her sentence was

excessive. Moreover, although defense counsel stated at the hearing on the post-sentencing motion "[w]e're asking that the 43-year sentence was excessive, given the circumstances," this undeveloped assertion was insufficient to preserve the issue for review. See *Johnson*, 250 Ill. App. 3d at 893 (noting that broad and general allegations are inadequate to advise the trial court of the challenge being raised, and are therefore inadequate to preserve an issue for appellate review). Consequently, this issue has been forfeited on appeal. *Sebby*, 2017 IL 119445, ¶ 48 (noting that the failure to make a contemporaneous objection and raise the issue in a written post-sentencing motion constitutes forfeiture); *Reed*, 177 Ill. 2d at 393-94 (holding that the 1993 amendment to section 5-8-1(c) of the Code requires that a defendant file a written post-sentencing motion in the trial court to preserve sentencing issues for appellate review). Because defendant failed to preserve this issue for review, we turn to her request that we review the issue under the plain-error doctrine.

¶ 92    As noted previously, the plain-error doctrine serves as a narrow and limited exception to the general forfeiture rule. *Hillier*, 237 Ill. 2d at 545. To prevail under the plain-error doctrine, a defendant must first demonstrate clear and obvious error. *Piatkowski*, 225 Ill. 2d at 565; *Jackson*, 2021 IL App (1st) 180672, ¶ 21. If an error occurred, we will reverse only where (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion. *Hillier*, 237 Ill. 2d at 545. If the defendant fails to meet this burden, the procedural default will be honored. *Hillier*, 237 Ill. 2d at 545. Thus, we must first determine whether a clear or obvious error occurred.

¶ 93    Prior to addressing whether a clear or obvious error occurred, we observe that defendant requests that we assess the excessiveness of her sentences in the aggregate. We decline defendant's invitation. Our supreme court has long held that consecutive sentences do not constitute a single

sentence and cannot be combined as though they were one sentence for one offense. See, *e.g.*, *People v. Phelps*, 211 Ill. 2d 1, 14-15 (2004); *People v. Carney*, 196 Ill. 2d 518, 530 (2001); *People v. Thomas*, 143 Ill. 2d 271, 278-79 (1991); see also *People v. Elliott*, 272 Ill. 592, 600 (1916) ("The only reason that the fines aggregate a large sum and the imprisonment is for a long period is because there were so many violations of the law prosecuted under one indictment, but the punishment under each count must be considered by itself."); *People v. Turyna*, 2021 IL App (2d) 180592-U, ¶ 84 (considering whether the defendant's individual sentences were excessive in lieu of the defendant's request to review his sentences in the aggregate). Although defendant directs us to cases in which the courts have purportedly addressed the excessiveness of consecutive sentences in the aggregate, we note that none of those cases discuss the supreme court authority set forth above. See, *e.g.*, *People v. Kulpin*, 2021 IL App (2d) 180696; *People v. Ressa*, 2019 IL App (2d) 170439; *People v. Butler*, 2013 IL App (1st) 120923; *People v. McGowan*, 2013 IL App (2d) 111083.

¶ 94    Defendant also cites to *Stacey*, 193 Ill. 2d at 209-12, "where the Illinois Supreme Court 'reduced the defendant's aggregate sentence from 50 years to 12 years.' " However, *Stacey* does not support defendant's position that the excessiveness of consecutive sentences should be considered in the aggregate. In *Stacey*, the defendant was sentenced to two consecutive prison terms of 25 years each. On appeal, he argued that his 50-year sentence was excessive. However, in addressing the defendant's argument, the supreme court treated each sentence individually. The supreme court stated that "[g]iven the nature of the crimes, *the 25-year sentences* imposed are excessive and an abuse of discretion on the part of the trial court" and that "the level of seriousness of the offenses does not warrant *25-year sentences*." (Emphasis added.) *Stacey*, 193 Ill. 2d at 210-11. Ultimately, the supreme court held that "the trial court abused its discretion in sentencing [the]

defendant to *25-year prison terms*." (Emphasis added.) *Stacey*, 193 Ill. 2d at 210. Thus, *Stacey* supports treating the excessiveness of each sentence individually and not as a unit. Consequently, in addressing this issue, we reject defendant's request that we consider her sentences in the aggregate. Instead, we will address defendant's challenge as a claim that each of her individual sentences was excessive. See *Turyna*, 2021 IL App (2d) 180592-U, ¶ 84.

¶ 95     The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A reviewing court should not disturb a sentence that is within the applicable sentencing range unless the trial court abused its discretion. *Stacey*, 193 Ill. 2d at 209-10. In the sentencing context, an abuse of discretion occurs when a sentence is at great variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 210. It is the province of the trial court to balance relevant factors and make a reasoned decision as to the appropriate punishment in each case. *Latona*, 184 Ill. 2d at 272. A reviewing court may not substitute its judgment for that of the trial court merely because it would have weighed the pertinent factors differently. *Stacey*, 193 Ill. 2d at 209. We presume a sentencing court has considered all relevant factors unless the record affirmatively shows otherwise. *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001).

¶ 96     In determining the appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, punishment, and the defendant's rehabilitative potential. *People v. Kozlow*, 301 Ill. App. 3d 1, 8 (1998). "The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The weight that the trial court should attribute to each factor in aggravation and mitigation depends upon the particular circumstances of the case.

*Kozlow*, 301 Ill. App. 3d at 8. As long as the trial court " 'does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense.' " *People v. Bosley*, 233 Ill. App. 3d 132, 139 (1992) (quoting *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990)). Reviewing courts presume that a sentence within the statutory guidelines is proper. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 36; *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992).

¶ 97     We conclude that the sentences imposed in this case were a proper exercise of the trial court's discretion. First, as we observed previously in this order, all three sentences imposed by the trial court—20 years for home invasion, 18 years for armed violence, and 5 years for aggravated domestic battery—fell within the applicable sentencing range. Thus, they are presumed to be proper. *Burton*, 2015 IL App (1st) 131600, ¶ 36; *Boclair*, 225 Ill. App. at 335. Indeed, we note that the sentences are in the middle of the permissible sentencing guidelines for each offense. Moreover, the sentences imposed in this case were neither at great variance with the spirit and purpose of the law nor manifestly disproportionate to the nature of the offenses. As we observed earlier, the evidence establishes that defendant actively sought out Janes, her ex-boyfriend, and acted as the aggressor. She went to Kelly's condominium in the middle of the night armed with a box cutter and a metal pipe. She then broke into the condominium and began an altercation with Janes and Kelly. As a result of the attack, Janes sustained lacerations to multiple areas of his body, requiring a large number of stitches. Kelly sustained a welt from being hit with the metal pipe as well as cuts to her finger and rib area. In light of this record, sentences in the middle of the statutory sentencing range were well within the trial court's discretion.

¶ 98    Defendant nevertheless asserts that the sentence imposed therefore amounts to a *de facto* life sentence and fails to provide her with an opportunity for rehabilitation or restoration to useful citizenship. While it is likely defendant will be incarcerated for much of her remaining life, this is as much a function of her age as it is the length of each sentence. See *People v. Martin*, 2012 IL App (1st) 093506, ¶ 50 ("While defendant is arguably correct that his combined prison terms likely constitute a *de facto* life sentence, we nevertheless cannot say that the trial court abused its discretion"); see also *Elliott*, 272 Ill. at 600. Defendant cites to no authority to suggest that an older person is entitled to a more lenient sentence than a younger person simply by virtue of being older. As such, this point is forfeited. *People v. Taylor*, 2013 IL App (2d) 110577, ¶ 31.

¶ 99    Defendant also complains that the sentences imposed do not consider her rehabilitative potential. Defendant asserts that this was improper especially where her personal background suggests that she possesses the capability and potential for rehabilitation. In this regard, defendant observes that she holds a bachelor's degree in English and was previously a homemaker who took care of her five children. Where the defendant has presented mitigating evidence at the sentencing hearing, the reviewing court will presume that the sentencing court considered it, absent some indication to the contrary. *People v. McCain*, 248 Ill. App. 3d 844, 853 (1993). Additionally, where the trial court has examined the PSI report, it is presumed that the court considered the defendant's potential for rehabilitation. *McCain*, 248 Ill. App. 3d at 853. The only argument advanced by defendant in support of her position is that the trial court never mentioned rehabilitation when it sentenced her. However, a sentencing court is not obligated to recite and assign value to each factor upon which it relies. *McCain*, 248 Ill. App. 3d at 854. In any event, the trial court here stated that it had reviewed the PSI report. Thus, it was aware of defendant's family and educational background and the assessment that she was at a low-to-moderate risk of reoffending. As such,

defendant's claim that the trial court did not consider her rehabilitative potential is unsupported by the record.

¶ 100   Defendant suggests that to the extent that the trial court considered her rehabilitative potential, it gave the factor insufficient weight. However, a trial court need not place greater weight on a defendant's rehabilitative potential than on other factors. See *McCain*, 248 Ill. App. 3d at 854. Moreover, in essence, defendant is asking us to reweigh the evidence presented to the trial court and assign greater weight to the evidence she cites than did the trial court. However, as noted above, as a reviewing court, we simply are not permitted to do this. *Stacey*, 193 Ill. 2d at 209.

¶ 101   Defendant also contends that the sentences are excessive in light of the fact that she had "never before been convicted of a violent crime and also never been sentenced to any prison time, *i.e.*, where there was no indication that a decades-long prison term was necessary." She therefore asserts that the sentences are "unduly harsh, manifestly unjust, and fail to comport with the objective of rehabilitating or restoring [her] to useful citizenship." Again, this is merely a request that we reweigh the evidence. The trial court was aware of defendant's criminal history and was in a better position to fashion an appropriate sentence. We cannot now substitute our judgment for that of the trial court by reweighing factors. *Stacey*, 193 Ill. 2d at 209. Because we can identify no clear or obvious sentencing error to support defendant's claim that her sentences are excessive, she is not entitled to relief under the plain-error rule. *Hillier*, 237 Ill. 2d at 545.

¶ 102   That leaves defendant's contention that trial counsel was ineffective for failing to raise this precise issue in his written post-sentencing motion. As noted earlier, for a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test in *Strickland*, 466 U.S. 668. See *Hodges*, 234 Ill. 2d at 17. A defendant must first establish that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or

she was not functioning as the counsel guaranteed by the sixth amendment. *Hodges*, 234 Ill. 2d at 17; *Manning*, 227 Ill. 2d at 416. Second, a defendant must establish that counsel's deficient performance prejudiced him or her. *Hodges*, 234 Ill. 2d at 17. In most situations, this is done by showing a reasonable probability that the outcome of the proceeding would have been different absent counsel's errors. *Valdez*, 2016 IL 119860, ¶ 14. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *Peterson*, 2017 IL 120331, ¶ 79. In this case, we have already concluded that the sentences imposed by the trial court were not excessive. Because defendant's sentences were not excessive, she was not prejudiced by trial counsel's failure to raise this exact issue in her post-sentencing motion or develop it at the sentencing hearing. Thus, her claim based on ineffective assistance of counsel fails.

¶ 103                                    III. CONCLUSION

¶ 104   For the reasons set forth above, we affirm the judgment of the circuit court of Kendall County.

¶ 105   Affirmed.